**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Eric Fuhs, Jeffery Bailey, William LaFleur, Daryl Gardner, and Harold Roe, | : : : | CIVIL ACTION: 16-cv-376-NBF |
| Plaintiffs, | : : | |
| v. | : : | |
| McLachlan Drilling Company and James E. McLachlan, | : : : | |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SANCTIONS**

## I.     INTRODUCTION

Defendant's motion for crippling sanctions against both Plaintiffs and their counsel is betrayed by certain critical facts omitted from the moving papers. First, the central feature of Defendants' motion—production from Plaintiffs' cell phones—was never once addressed by Defendants during the Rule 26 conference in this case, or at any time in the earlier FLSA case, *Stroman v McLachlan*, and was never made the subject of a motion to compel. In fact, Defendants did not request that Plaintiffs forensically gather and search their cell phones until July 12, 2017, after the discovery deadline in this case had already been extended *twice*, and years after *Stroman* was settled. Moreover, the discovery requests upon which Defendants now hinge their motion are written in boilerplate, overbroad language that fail to alert any reasonable person to the claims Defendants now address with the Court.

Second, Defendants' papers ignore the stark contrast in the efforts made by Plaintiffs and their counsel to produce relevant text messages as compared to Defendants and their counsel.

Following Defendants' belated request to gather and forensically search Plaintiffs' cell phones, Plaintiffs' counsel gathered ten separate cell phones, imaging seven, and then carefully reviewed *eleven thousand* text messages for production to Defendants. In contrast, Defendants and their counsel have produced a total of *two* text exchanges, despite providing their supervisors with company phones.

Third, Defendants contention that Plaintiffs' obligation to forensically preserve and search Plaintiffs' cell phones dates back to before, or at least the beginning of, the *Stroman* case ignores that four of the five Plaintiffs here opted into the *Stroman* settlement only *after* the conclusion of that litigation, and therefore were neither subject to discovery obligations nor under a duty to preserve during the earlier case.

Fourth, Defendants' fictional mural of non-compliance is based upon factual manipulations, and fails to fairly summarize the essential facts pertaining to Plaintiffs' production of relevant text messages. Plaintiffs provide that missing and essential detail herein. For example, one of the plaintiffs, Jeff Bailey, never had a personal cell phone during his employment with Defendants, but instead had a company phone which he turned in when he was terminated, and which the Defendants—at Plaintiffs' request—imaged and searched, and from which *no* ESI was produced to Plaintiffs.

Fifth, every single circumstance detailed in the defense brief is easily explainable, save one: the loss of Eric Fuhs's cell phone on the day of his deposition, which he had left for safekeeping at his home while in the middle of a very acrimonious divorce, and which his former spouse understood was important to him. More importantly, this phone had already been searched for relevant text messages and those messages were produced in this case.

Finally, and most significantly, there is a telling reason why Defendants never requested forensic imaging of cell phones in the Rule 26(f) conference (or for nearly a year afterward): contrary to the defense representation in their motions, the cell phones were never critical proof, and are certainly not central to this case, which instead is based on brazen and direct evidence of retaliation, including management referring to anyone who joined the *Stroman* case as a "nigger".[1] There are many other examples of this compelling proof that have little or nothing to do with Plaintiffs' cell phones.

In summary, while there is certainly a debate about whether the proportionality standards of Rule 26 would ever require plaintiffs in individual retaliation cases to go through effort and expense to image cell phones, that normal debate is much stronger for the Plaintiffs in this case. That is because here the defense only belatedly made requests for the information they now say is critical to their case, only after they sensed tactical advantage, and not because the information was critical to the Plaintiffs or the defense. Here, the Plaintiffs and their counsel took reasonable steps to preserve and produce discovery in this case, and this sanctions motion should be summarily denied.

## II.   FACTUAL BACKGROUND

Defendants' motion for sanctions is premised on the argument that ESI is "central" to Plaintiffs' claims. (*See* Docket No. 51 ("Defendants' Brief") at 4–5.) That is patently false. The big picture is this: the record contains overwhelming evidence—having virtually nothing to do with ESI—indicating that Defendants threatened to terminate and even inflict violence on those who joined the Stroman case, using hostile language to describe opt-ins, including "niggers," "greedy fuckers," and a "piece of shit."

---

[1]   The named Plaintiff in that case, Stanley Stroman, is an African-American man.

### A.   What Is Central to Plaintiffs' Claims: Evidence of Defendants' Threats, Epithets, and Retaliatory Intent

In a sworn declaration, former McLachlan operator Greg Thornberry, who is not a plaintiff in this case, stated his belief that Defendants retaliated against Plaintiffs and others because of their participation in *Stroman*. (Ex. A ¶ 7.[2]) Thornberry witnessed:

- McLachlan Field Superintendent Dan Campbell, Defendants' second in command, telling employees, including Gardner, that anyone who joined *Stroman* was a "bunch of niggers." (Ex. A ¶ 4.)

- McLachlan Field Supervisor Levi Hulliberger threatening to "kick [the] ass" of anyone that joined *Stroman*. (Ex. A ¶ 3.)

- McLachlan treating plaintiff Roe badly: laying him off right before his hitch was supposed to start and soon after he joined *Stroman*, while letting others stay on the job longer. (Ex. A ¶ 6.)

- Craig McLachlan suddenly freezing employees out of work-related social situations after they joined *Stroman*. (Ex. A ¶ 5.)

Plaintiffs also experienced Defendants' threats and epithets first-hand. Gardner testified that:

- Field Superintendent Campbell referred to potential *Stroman* participants as "niggers" and "lowlifes". (Ex. G at 15:16-16:20.)

- Defendants' second-in-command and field supervisors regularly talked about the ramifications for employees who participated in *Stroman*, including threats of termination, and, on at least one occasion, physical violence. (Ex. G at 15:14-16:20, 23:4-24:7, 61:7-20.)

- Defendant James McLachlan called Roe "worthless" and a "piece of shit" because he joined *Stroman*. (Ex. G at 66:13-16, 37:18-38:8.)

- Craig McLachlan said *Stroman* participants were stealing McLachlan's money. (Ex. G at 18:35-19:12.)

- Field Supervisor Jon Mio said *Stroman* participants "know what they're in for." (Ex. G at 43:10-20.)

---

[2] Factual citations within this Memorandum will be to documents previously ECF-filed herein, or to the Exhibits that will be filed contemporaneously with this Memorandum. An Exhibit List will also be filed, for ease of reference.

- Field Supervisor Levi Hulliberger called *Stroman* "bullshit," and said he "wanted to go to everybody's houses that signed up on the lawsuit and beat their ass or punch them in the face." (Ex. G at 23:4-8; 61:7-20.)

Likewise, Fuhs testified that Field Supervisor Lohrer told him that Defendant James McLachlan threatened in a meeting to get rid of employees who joined *Stroman*. (Ex. E at 10-12.) More generally, all Plaintiffs testified about similar experiences of retaliatory threats. (*See, e.g.*, Ex. I at 85-88, 90-94, 103-04; Ex. J at 25:22–28:10; Ex. K at 57-60, 70-71, 81, 124-26.)

The record is replete with non-ESI evidence that Defendants intentionally retaliated against Plaintiffs because they participated in *Stroman*. This is not to say there is no ESI corroborating Plaintiffs' retaliation claims. There is. In one of the two text exchanges produced by Defendants, Field Supervisor Lohrer said: "We got sued by our employees, my boss is hateful now." (Ex. L.) Lohrer further clarified the lawsuit was related to the FLSA "day rate thing" and called the employees "greedy fuckers." (*Id.*) Regardless, ESI is clearly *not* central to Plaintiffs' claims or proof thereof.

**B.**     **What Is Not Central to Plaintiffs' Claims: References to ESI in the Complaint**

Further ignoring the substance of Plaintiffs' claims, Defendants hide behind a series of citations and ellipses. (*See* Defs' Br. at 4, 16.) They say that Plaintiffs claims "center on dozens of phone calls, voice-mails and text messages," and that "it bears repeating" that Plaintiffs' Complaint "is built on cell-phone calls, voice-mails, and text messages…." (*Id.*) Then, they flag some electronic-sounding words, add some ellipses, and call it a day.

Defendants' exaggeration here is staggering. First, while Defendants suggest the Complaint refers to "dozens" of "phone calls, voice-mails, and text messages," the allegations

they cite refer to *thirteen* calls, *one* voicemail, and, at most, a handful of text messages.[3] To fully appreciate the scale of Defendants' distortion, it is necessary to look at each allegation in turn.

At paragraph 27, the Complaint[4] alleges that on April 13, 2015, "one of the rig workers called and informed Roe that he had heard that Roe was not going to be called back to the rig." At paragraph 28, the Complaint alleges "Roe called Campbell to investigate," and he "confirmed that Roe was not going to be called back to work." The fact of these calls is incidental to the case, not central. What matters is whether Campbell told Roe that he was not being called back to the rig. And Defendants *admit* that fact. (Answer, Docket No. 12 ¶¶ 27-28.)

At paragraph 32, the Complaint states that Roe called James McLachlan and Campbell to discuss his employment status, but both refused to discuss it. It is important to distinguish the issue of *what was said* in these calls from the issue of *whether these calls happened*. The latter would be shown by ESI (specifically, call logs); the former would not. And while neither issue is particularly important to the case, the simple fact that these calls occurred (which is the only thing ESI could teach us) is completely non-probative of anything at issue in the litigation.

At paragraph 45, the Complaint alleges that Campbell called Bailey to discuss calling the crew to tell them not to report to the rig. Then, at paragraph 46, the Complaint states that Bailey did as told. Again, the fact of the calls is incidental and not in dispute. (Answer, Docket No. 12 ¶ 45.)

At paragraph 48, the Complaint states that Campbell called Bailey to tell him to drive back to Michigan because James McLachlan "wanted to see him in the office…." This is also undisputed. (Answer, Docket No.12 ¶ 48.) Then, at paragraphs 49 and 50, the Complaint alleges

---

[3] Regarding text messages, in particular, *see* discussion of Complaint paragraphs 49 and 64 below.
[4] Docket No. 1.

that Campbell told Bailey during that call that he was shocked and disappointed to learn Bailey joined the settlement, and that someone had texted James McLachlan to apologize for joining the settlement. Campbell admits telling Bailey during a call that he "couldn't believe" he had joined *Stroman* and that he was "disappointed" in him. (Ex. M at 77:16–79:6.) The apologetic text message was never in plaintiffs' possession, because it was between McLachlan and Campbell's "someone." Defendants have not produced it.

At paragraph 63, the Complaint states that Fuhs received a call from Defendants on September 29, 2015, about renewing insurance. Defendants admit calling Fuhs about that subject. (Answer, Docket No. 12 ¶ 63.) Then, at paragraph 64, the Complaint states that Fuhs received text messages from coworkers suggesting he might be called back to work. Fuhs clarified in his deposition that he received one such message. (Ex. E at 56.) That text message was preserved, found, and produced to Defendants. (Ex. U.) At paragraph 66, the Complaint alleges that Campbell called Fuhs and left a voicemail saying he was disappointed in him for joining *Stroman*. Fuhs testified that he immediately deleted the voicemail without thinking because he was so upset. (Ex. E at 105-06.) Defendants deny making this call, but admit calling employees back to work other than Fuhs. (Answer, Docket No. 12 ¶ 67; *see also* Ex. M at 38:4–39:10.)

At paragraph 69, the Complaint alleges that, on October 1, 2015, James McLachlan called Chris Fuhs to say Defendants might forgive his son for joining. Defendants admit the fact of the call, but dispute the alleged content. (Answer, Docket No. 12 ¶ 69.) Then, at paragraphs 70-71, the Complaint states that Campbell called Fuhs to offer a position on a temporary rig, that Fuhs accepted, and that Campbell called him before the hitch was to begin because Defendants were replacing him with someone who had not joined. Defendants admit the fact of the calls, but

dispute part of the underlying allegations. (Answer, Docket No. 12 ¶¶ 70-71.) They admit the job offer, acceptance, and rescission. (*Id.*)

Finally, at paragraph 82, the Complaint alleges that, on October 23, 2015, LaFleur called Campbell regarding his employment status and that Campbell said Defendants "had no work for him." Neither Plaintiffs nor Defendants have produced a call log proving or disputing the fact of this call, and in any event, Defendants admit LaFleur has not been called back to work since participating in *Stroman*. (Answer ¶ 83.)

The Complaint does not refer to "dozens" of calls, voicemails, and text messages, much less dozens of calls, voicemails, and text messages central to Plaintiffs' claims. The thirteen calls are largely admitted, and, in any case, incidental to the allegations. That Defendants have not produced a single record of any call shatters any pretense that call-related ESI is central Plaintiffs' claims. For sure, one voicemail in the Complaint was deleted in anger immediately upon receipt, but its loss only helps Defendants. Finally, only one text message in the Complaint was ever in Plaintiffs' possession; it has been produced; and its substance is not in dispute.

### III.   HISTORY OF THE CASE

**A.   From an Overtime Case in *Stroman* to a Retaliation Case in *Fuhs***

Nichols Kaster filed Roe's consent form in *Stroman* on March 19, 2015. (Ex. D. ¶ 7.) The next day, counsel sent him a letter with a litigation hold. (*Id*. ¶ 8.) Bailey, Gardner, LaFleur, and Fuhs did not receive the litigation hold letter in *Stroman* because they only opted into the settlement, not ongoing litigation. (*Id*. ¶¶ 18-19.) Counsel learned of possible retaliation by Defendants in April 2015 and later received reports of retaliation around October 2015. (*Id*. ¶¶ 10, 21.) But the firm did not decide to bring a retaliation case on Plaintiffs' behalf until February 2016. (*Id*. ¶¶ 26-28; Ex. O ¶ 4.)

Plaintiffs filed *Fuhs* on March 31, 2016. (Ex. O ¶ 5; Docket No. 1.) The case was then transferred from the firm's wage-and-hour group to its individual case group. (Ex. D ¶ 28.) On April 6, 2016, counsel sent a letter and preservation memo to Plaintiffs. (Ex. O ¶ 7; Ex. P, Q.) The memo said to "[p]lease pay special attention to electronic data and electronic records . . . [which] may be located in places you might overlook or not ordinarily think of as containing 'documents[]' … [such as] cell phones." (Ex. Q.)

After early settlement negotiations failed, Defendants filed their Answer on August 8, 2016. (Docket No. 12.) On August 16, the parties—including e-discovery professionals—held the Rule 26(f) conference by phone. (Ex. O ¶ 10.) The parties discussed discovery of ESI during the call as required by Local Rule 26.2. (*Id*. ¶ 11.) That discussion focused exclusively on discovery of ESI in Defendants' possession. (*Id*.) Defendants did not request that Plaintiffs forensically collect email or phones; did not ask whether and how that might be done; and, in fact, did not even raise the subject of ESI that might be in Plaintiffs' possession. (*Id*.) Later that day, Plaintiffs' counsel wrote letters to Plaintiffs about the status of the case, which also asked Plaintiffs to "gather[] any documents (including emails or text messages) that you have in your possession related to your employment with McLachlan." (*Id*. ¶ 13; Ex. R.)

## B.   Defendants Serve Boilerplate Discovery Requests that Do Not Emphasize ESI

On September 30, 2016, Defendants served written discovery. (Ex. O ¶ 14; Ex. S.) Only two interrogatories (Nos. 2 and 9) discussed ESI at all, and both were boilerplate, catch-all requests. (Ex. S.) One request for production (No. 10) was also a boilerplate request for all documents, including ESI. (*Id*.):

> 10.   All calendars, notebooks, diaries, logs, correspondence, e-mail messages, text messages, voice mail messages, social media communications or posts, computer disks or other documents reflecting or relating to any of the claims alleged in your Complaint.

An overlapping request (No. 11) sought documents relating to 76 out of 117 paragraphs from the Complaint. (*Id*.)

Following receipt of Defendants' Discovery Requests, Plaintiffs' counsel wrote to each Plaintiff on October 6, requesting information to respond to the requests, including "email messages, text messages or social media posts relating to this lawsuit." (Ex. O ¶ 18; Ex. T.)

When they served their discovery requests, Defendants again failed to initiate a discussion about whether Plaintiffs would forensically collect ESI from phones. (Ex. O ¶ 17.)

**C.**   **Defendants Collect Hundreds of Thousands of ESI Items and Produce Almost None**

Between October 28 and November 11, 2016, the parties exchanged at least fourteen emails and had at least five telephone conversations regarding the search terms to be applied to ESI in Defendants' possession. (*Id*. ¶ 23.) *Not once*, during any of these conversations, did Defendants' counsel inquire as to whether, or when, Plaintiffs' counsel might forensically collect ESI from Plaintiffs' phones. (*Id*.) On November 11 and 13, Defendants produced the relevant ESI they had collected. (*Id*. ¶ 21.) Though Defendants claimed to have collected over 183,000 items of ESI from their custodians' cell phone, Defendants ESI production contained a grand total of *two* unique text messages. (Ex. O ¶ 20-22; Ex. L.) Neither was from James McLachlan's cell phone. (*See* Ex. L.) Neither was from Campbell's cell phone. (*See* Ex. L.) And neither was from Plaintiff Bailey's company-issued cell phone. (*See* Ex. L.)

**D.**   **Plaintiffs' ESI**

The parties mediated on November 15, 2016 in Pittsburgh. (Ex. O ¶ 26.) During the mediation, counsel met with each Plaintiff individually to discuss Defendants' Discovery Requests in more detail. (*Id*.) Based on these and prior discussions, counsel concluded there were likely three relevant pieces of ESI in Plaintiffs' possession. (*Id*. ¶ 27.) The first was the text

exchange referenced in the Complaint between Fuhs and an oil company coworker about Fuhs's job status in early October 2015. (*Id.*; *see also* Ex. U.) The second was a text exchange between Fuhs and Campbell about Fuhs's job status in late October 2015.[5] (*Id.*) The third was a photo of a McLachlan employee list used to call people back to work and from which Plaintiffs had been removed after joining *Stroman*. (Ex. O ¶ 27; Ex. C.) Counsel also learned that Plaintiffs had previously provided these items to the firm. (Ex. O ¶ 28.)

Following mediation, counsel set about trying to find these documents. (*Id.* ¶ 29.) Counsel looked in all filing systems in which these documents could have been stored; worked with paralegals, technology professionals, and other administrative staff; looked through the emails of a former Nichols Kaster attorney and former paralegal; and called the former attorney. (*Id.* ¶ 29.) The efforts were unsuccessful. (*Id.* ¶ 30.) But to their credit, Plaintiffs themselves eventually found and resent the relevant ESI. (*Id.*; Ex. KK ¶ 17.) All was produced prior to Plaintiffs' depositions. (Ex. O ¶ 30.)

**E.     Defendants' December 14, 2016 Deficiency Letter**

On December 14, 2016, Defendants' counsel wrote to Plaintiffs' counsel regarding deficiencies in Plaintiffs' discovery responses. (*Id.* ¶ 31; Ex. V.) The letter did not address any deficiencies in Plaintiffs' responses to the requests that mentioned ESI. (*Id.* ¶ 32; Ex. V.) Instead, the letter focused on Plaintiffs' employment and medical records, other lawsuits, and criminal records. (Ex. V.) The letter mentioned ESI once, when noting that no documents had yet been produced on behalf of Fuhs; it was silent as to ESI from the other Plaintiffs. (*Id.*) Once again, Defendants expressed no concern about forensically collecting from Plaintiffs' cell phones. (*Id.*)

**F.     Defendants Take Sudden Interest in ESI Three Weeks before Close of Discovery**

---

[5] Defendants never produced this or any other text exchange involving Campbell.

On April 5, 2017, Defendants served a second deficiency letter on Plaintiffs. (Ex. O ¶ 40; Ex. X.) For the first time, three weeks before the April 28 discovery deadline, Defendants expressed concern about Plaintiffs' responses to those of Defendants' discovery requests that sought ESI. (*Id.*) The parties met and conferred on April 9, and Defendants noted for the first time that the Complaint referenced ESI that had not been produced. (Ex. O ¶ 45.). (*Id.*) They also asked to extend discovery deadlines and stated their intent to delay Plaintiffs' depositions. (*Id.*)

Between April 11 and April 13, 2017, Plaintiffs took depositions of four McLachlan witnesses. (*Id.* ¶ 43.) Defendants claim that "the predominant, if not sole, source of exhibits" at these depositions were text messages. (Defs' Br. at 5.) This is completely false. In fact, of the 45 exhibits Plaintiffs used in these depositions, only eight were text exchanges (the two text exchanges that Defendants produced, used in multiple depositions). (Ex. O ¶ 44.)

## G.   **Bailey's Audio Recordings**

On March 7, Plaintiffs' counsel received documents from Bailey responsive to Defendants' Discovery Requests; they served Bailey's discovery responses on March 9. (Ex. O ¶ 38.) Counsel did not produce Bailey's audio recordings at that time. Then in April 2017, Plaintiffs were preparing to make a supplemental production, to make sure all documents, including recently-received tax records, were produced to Defendants well before Plaintiffs' depositions. (*Id.* ¶ 45.) To that end, counsel had to determine what to do with the audio recordings that Bailey had made, the legality of which concerned counsel. (*Id.* ¶ 46.) It was necessary to conduct legal research on that issue; on counsel's duties both to the client and to the tribunal; and on whether the privilege against self-incrimination allowed for the withholding of the recordings. (*Id.*) Counsel also consulted with Nichols Kaster's ethics partner, and with a Pennsylvania attorney specializing in criminal defense. (*Id.*) Ultimately, after taking these steps

12

and discussing the issue in detail with Bailey, counsel determined that the recordings had to be produced if Bailey was to continue with the litigation. (*Id*.) Plaintiffs' counsel produced the audio recordings on or about April 21, 2017, over a month-and-a-half before Bailey's June 6, 2017 deposition. (*Id*. ¶ 47.)

**H.      Defendants Bring a Surprise, Defamatory Motion to Extend Discovery**

On Friday, June 2, 2017, one business day before Plaintiffs' depositions were scheduled to begin in Pittsburgh, Defendants filed a motion to extend the discovery deadline. (Docket No. 38.) The motion came without warning, alleged spoliation, and even insinuated that Plaintiffs had altered Bailey's audio recordings. (Docket No. 38-2 at 11.) (After casting these baseless aspersions, Defendants quietly abandoned them in the present motion.)[6] Yet, Defendants had not previously—and still have never—moved to compel discovery from Plaintiffs. (Ex. O ¶ 49.)

On June 8, 2017, while Plaintiffs were in Pittsburgh, Defendants produced nearly 200 pages of documents they had received in response to subpoenas served on Plaintiffs' employers. (*Id*. ¶ 52.) Defendants had served the subpoenas three months earlier, and metadata suggests Defendants received the documents in March and April 2017 (*Id.*) Defendants used some of those records the next day in Roe's deposition. (*Id*.)

After getting a second discovery extension, Defendants did nothing for more than a month. (*Id*. ¶¶ 54-55.) Finally, on July 12, 2017, Defendants sent a letter requesting, *for the first time*, that Plaintiffs forensically image their cell phones. (*Id*. ¶ 59; Ex. Y.) Plaintiffs responded on July 26 and August 4, 2017. (Ex. O ¶ 60; Ex. Z, AA.) They provided Defendants with all requested information. (*See* Ex. Z, AA.)

---

[6] Defendants rejected multiple offers to inspect the device themselves and demanded Plaintiffs get a declaration from a third-party vendor regarding potential spoliation. In fact, there were no indications of spoliation. *See* Ex. EE.

## I.     Forensic Examination Corroborates Plaintiffs' View of ESI

Between August 2 and 20, 2017, Plaintiffs sent ten cell phones to Enterprise Knowledge Partners, LLC ("EKP") for forensic imaging. (Ex. O ¶ 61.) By August 28, Plaintiffs had received all data EKP was able to gather from the phones. (*Id*. ¶ 64.) In total, the cell phones contained 10,903 messages. (*Id*.) Plaintiffs manually reviewed them all and produced a total of 406 messages. (*Id.* at ¶¶ 64-68; *see* Ex. FF through II.) Many of the 406 messages were not relevant themselves, but merely provided context for others that were. (*Id*.) And even the relevant messages had little to do with Plaintiffs' claims of retaliation. (*Id*.) They were certainly not central to the case.

## J.     Plaintiffs' Devices

Defendants lump the Plaintiffs together when discussing their cell phones. But each Plaintiff must be considered individually. This section does that, and the following table will aid in the analysis.

| Plaintiffs' Phone Timeline | | | | | | |
|---|---|---|---|---|---|---|
| **Fuhs** | Verizon Pre-Paid<br>*2015 – 06/2016* | | | Samsung Galaxy 4<br>*06/2016 - present* | | |
| **LaFluer** | Huawei 1<br>*11/2014 – 11/2015* | Huawei 2<br>*11/2015 – 10/2016* | | Huawei 3<br>*10/2016 – 06/2017* | | |
| **Bailey** | Company's Phones<br>*Until 10/2015* | Flip Phone<br>*2015 – Spring 2016* | Boost<br>*Spring '16* | S. Galaxy<br>*05/2016 – 04/2017* | LG<br>*04/2017 – 06/2017* | LG Fiesta<br>*PR* |
| **Gardner** | Flip Phone<br>*2015 – 10/2015* | Samsung Galaxy<br>*10/2015 – 05/2017* | | | | Sam. Gal. Note 4<br>*05/2017 – present* |
| **Roe** | Samsung Galaxy Note 3<br>*01/2015 – 04/2016* | | | Samsung Galaxy S7 Edge<br>*04/2016 - present* | | |
| | Mar-15 | Jun-15 | Sep-15 | Dec-15 | Mar-16 | Jun-16 | Sep-16 | Dec-16 | Mar-17 | Jun-17 |

## 1.     Roe's Devices

Roe never lost a phone, either that was in use during the relevant time period in 2015, or at any time since. Both his phones were preserved, imaged, reviewed, and produced.

Roe used a Samsung Galaxy Note 3 cell phone between January 2015 and April 2016. (Ex. JJ ¶ 4.) In April 2016, he switched to a Samsung Galaxy S7 Edge. (*Id.*) He used the phones to send text messages and Facebook messages, but he did not believe he had any messages relevant to the case. (*Id.* ¶¶ 8.) Even so, at counsel's request, Roe did a manual search of both phones for relevant messages. (*Id.* ¶¶ 7, 9.) He focused on messages with former coworkers at McLachlan. (*Id.* ¶ 9.) Roe's review of the phones confirmed his belief that he had no relevant communications on his cell phones. (*Id.* ¶ 11.) After the review, he kept both phones in his possession, and he never purposely deleted any relevant text messages. (*Id.*) In or around April 2017, Roe sent his Note 3 to counsel for additional review, and counsel's manual review also did not reveal relevant messages. (*Id.* ¶ 12; Ex. CC ¶ 14-16.) He later sent the S7 Edge to counsel so that both phones could be forensically imaged. (Ex. JJ at ¶¶ 12-13.)

Defendants claim the messages produced from Roe's phones tell an "interesting story." (Docket No. 51 at 12-13.) But the story Defendants tell is a fairytale. They point out that of 350+ messages produced after forensic imaging, only 12 messages had previously been deleted, and he "*deleted nothing else.*" (*Id.* at 13 (emphasis in original).) Naturally, though, the reason all of the deleted messages produced to Defendants were *responsive* is that plaintiffs only produced responsive messages to Defendants—deleted or otherwise. In fact, there were 1,480 deleted messages recovered from Roe's Note 3. (Ex. CC ¶ 2.) Of these, only a few threads, containing 12 to 14 total messages, were even marginally relevant. (*See* Ex. GG.) The other deleted messages had no responsive information at all.

### 2.    Fuhs's devices

Fuhs used a prepaid Verizon phone from 2015 until roughly June 2016. (Ex. KK ¶ 3.) At counsel's request, he looked through his phone for relevant text messages sometime in 2015. (*Id.* ¶ 4.)  He identified two text exchanges—the Blankenship text and the Campbell text—which he took screenshots of and sent to Nichols Kaster. (*Id.* ¶¶ 5-6.)

In roughly June 2016, Fuhs started using a new phone—a Samsung Galaxy S4—but he kept the prepaid phone in order to preserve the information on it. (*Id.* ¶ 11.) Unfortunately, he misplaced the prepaid phone a few months later, when he was moving in October 2016. (*Id.* ¶ 12.) He was eventually able to find it, and when he did, he re-sent the two text exchanges he had previously sent to Nichols Kaster. (*Id.* ¶¶ 13-17.)

Fuhs stored his old prepaid phone on a shelf with other documents. (*Id.* ¶ 19.) In June 2017, Fuhs was to travel from Minnesota to Pittsburgh to be deposed. (*Id.* ¶ 18.) Plaintiffs' counsel wanted to get the prepaid phone from Fuhs because it had been in use during the time he worked at McLachlan. (Ex. OO ¶ 14; Ex. KK ¶ 18.) But fearing the possibility that the phone would get lost during travel, Plaintiffs' counsel advised Fuhs to leave it behind, and counsel would get the phone from Fuhs when they were both back in Minnesota. (*Id.*)

Fuhs and his wife were in the process of divorcing at this time, and he allowed her to use his absence as an opportunity to enter his house and get some of her belongings. (Ex. KK ¶ 20.) When Fuhs returned home, the phone was no longer where he had left it. (*Id.* ¶ 21.) Despite searching throughout his home, and repeatedly asking his wife about it, Fuhs has not been able to locate this phone. (*Id.* ¶ 23-24.) Fuhs did not delete anything from the phone in order to keep it from this litigation, and did not lose the phone in order to make it unavailable in this litigation. (*Id.* ¶¶ 7, 22-25.)

The Samsung Galaxy S4 that Fuhs began using in June 2016 has been imaged, and 2,345 messages were extracted from it; none were relevant. (*See* Ex. BB.) There is no evidence of relevant/responsive messages having been deleted.

### 3. Bailey's devices

During the time period that Bailey worked as a supervisor for McLachlan, he used only company-provided cell phones. (Ex. LL ¶ 3-4.) After he was terminated, he returned his McLachlan phone, and with it, every piece of ESI that it contained. (*See id.* at 5-8.) He does not believe he deleted anything while in possession of the McLachlan-issued phones. (*Id*. ¶ 8.)

Since Bailey was in need of a phone after his employment ended, Gardner loaned him an old Samsung Convoy flip phone. (*Id*. ¶ 9.) Bailey used the flip phone until May 2016. (*See id*. ¶ 10.)[7] He forwarded the callback list from this phone to his lawyers, and did not delete anything relevant. (*Id*. ¶ 11-12; *see also* Ex. CC ¶ 9.) Bailey was advised to preserve evidence, including ESI, but he did not immediately understand the import of that until speaking with counsel in person at the mediation. (Ex. LL ¶¶ 15-16.) Nevertheless, Bailey does not believe he ever intentionally deleted any messages. (*See generally id*.) Bailey thought he had lost the flip phone or given it back to Gardner, but he was eventually able to find it; it was imaged; and it contained no relevant messages.

In spring 2016, Bailey upgraded from the flip phone to a Boost Mobile smartphone. (*Id*. ¶ 14.) He only used this phone for months before it was stolen out of a hotel room while he was traveling. (*Id*. ¶ 17.) Bailey then used a Samsung Galaxy for about the next year, from May 2016 until April 2017. (*Id*. ¶ 18.) Next, Bailey switched to an LG phone, which he used for a short

---

[7] At the time of his deposition, Bailey did not know where the flip phone was, and believed he may have given it back to Gardner. (Ex. LL ¶ 10.) He later found it and provided it to counsel, and it was imaged. (*Id*.) 188 messages were extracted from it, the latest of them from May 2016. (*See* Ex. BB.) None were relevant.

time period before switching to a different provider in order to lower his bill. (*Id*. ¶ 19.) When

Bailey switched phones and providers, he gave his old LG to his daughter. (*Id*.) This phone—the

LG CDMA VS501 (.007)—was imaged, but contained no relevant messages. (*See* Ex. BB.)

Bailey believes he sent the only relevant text message—containing the callback list—to his

lawyers, and does not believe he ever deleted anything relevant to the lawsuit. (*See generally* Ex.

BB.) There is no evidence of any relevant messages ever having been deleted, and Defendants

have produced no ESI from Bailey's company cell phones, which were the phones Bailey was

using during the relevant time period.

### 4.    LaFleur's devices

LaFleur used a Huawei phone ("Huawei 1") from November 2014 to November 2015, at

which time it was stolen off a countertop at a bar. (Ex. MM ¶ 3.) He then got a new Huawei

phone ("Huawei 2") which was in use from November 2015 until around October 2016. (*Id*. ¶ 4.)

The screen to the Huawei 2 is cracked, and LaFleur no longer uses it. (*Id*. ¶¶ 4-5.) However,

LaFleur sent it to his counsel (*id*. ¶ 6), it was imaged, and 159 non-relevant messages were pulled

from it (*see* Ex. BB). After the screen on the Huawei 2 was cracked, LaFleur obtained a new

phone in October 2016 ("Huawei 3), which he used until June 2017. (Ex. MM ¶¶ 9-11.) The

Huawei 3 fell into the lake while LaFleur was loading his pontoon boat, sustaining water damage

that prevented an image from being taken of it. (*Id*. ¶ 10; Brinkworth Decl. ¶ 8.a.)

LaFleur never purposefully deleted any messages for the purpose of making them

unavailable in this litigation, and he never lost or destroyed a phone with that purpose. (Ex. MM

¶¶ 3, 10.) LaFleur admits that he texted with Bailey, Fuhs, and maybe Gardner, and that soon

after their layoffs those texts may have included discussion of whether McLachlan had any rigs

up and running and if Bailey "heard anything going on as far as work wise." (*Id*. ¶ 12; Ex. J 39-

40.) LaFleur did not believe that kind of text message would be relevant to this lawsuit; the only

text he has had that he believed relevant to this lawsuit is a photo of the callback list, which he

texted to his lawyers. (Ex. MM ¶ 12.) There is no evidence of any relevant messages having been

deleted from any of LaFleur's phones.

### 5. Gardner's devices

Gardner used the Samsung Convoy flip phone from before 2015 to around October 2015.

(Ex. NN ¶ 3.) He did not send many texts from it because it was difficult to text with. (*Id*.) In

October 2015, Gardner upgraded to a Samsung Galaxy Edge, and gave Bailey the flip phone to

use. (*Id*. ¶¶ 3-4.) Gardner had the Galaxy until May 2017, when he broke it while four-wheeling.

(*Id*. ¶ 10.) When he began using the Galaxy, it had an auto-delete function that was enabled, but

after receiving Nichols Kaster's preservation instructions he disabled that function. (*Id*. ¶¶ 5-8.)

Even though it had been broken, the Samsung Galaxy was successfully imaged, and 3,151

messages were pulled from it. (*See* Ex. BB.) Only 43 of those were even somewhat relevant,

consisting of six conversations in which Gardner appeared to be looking for work in May 2017.

(*See* Ex. II.) Gardner never deleted anything with the purpose of making it unavailable. (Ex. NN

¶¶ 5, 11.) And he took steps to preserve texts after he came to understand that he was supposed

to do that. (*Id*. ¶¶ 8-9.)

## IV.   ARGUMENT

This Memorandum will first address Defendants' request for spoliation sanctions under

Rule 37; any such sanctions are unwarranted. Neither are they warranted under Rule 26(g), as

shown in Section IV.B., below. Finally, this Memorandum will address, in Section IV.C., the

supposed misconduct at Fuhs's deposition. Defendants' motion must be denied on each and

every ground.

**A.**     **Defendants Have Not Come Close to Meeting their Burden of Proving Plaintiffs Violated Fed. R. Civ. P. 37(e) By Destroying Relevant Evidence.**

**1.**     **Applicable Legal Standard**

Rule 37(e), as revised by the December 1, 2015 amendments, specifically addresses the applicability of sanctions for spoliation of ESI. *Saller v. QVC, Inc.*, 2016 WL 4063411, at *4 (E.D. Penn. July 29, 2016). Under Rule 37(e), Defendants bear the burden of proving that: (1) ESI that should have been preserved in the anticipation of litigation was lost; (2) the producing party failed to take reasonable steps to preserve it; and (3) the evidence cannot be restored or replaced through additional discovery. *See* Fed. R. Civ. P. 37(e); *see also Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612, 615 (E.D. Pa. 2016); *Friedman v. Philadelphia Parking Authority*, 2016 WL 6247470, at *6 (E.D. Pa. Mar. 10, 2016). Only after each element has been proven may the Court "order measures no greater than necessary to cure the prejudice" under Rule 37(e)(1). Or, if the Court finds intent to deprive another of information's use in litigation, it may presume the lost information was unfavorable, issue an adverse instruction, or dismiss the action under Rule 37(e)(2).

**2.**     **Defendant Has Not—And Cannot—Identify Any Specific "Lost" ESI.**

Defendants' allegations of what is "lost" are based on speculation. This does not suffice. *See Friedman,* 2016 WL 6247470, at *7 (holding that "arguably negligent and at best absent-minded [conduct]" did not warrant sanctions because the aggrieved party failed to identify "lost" information). Defendants cannot rely on an unsubstantiated fear that there lurks, menacingly, some hypothetical boogeyman of damning lost information. Defendants' speculation is not credible when considering the peripheral place of ESI in Plaintiffs' proof. And it is even less credible when considering Defendants' own production history: if ESI were so critical, how

could Defendants have produced, in good faith, only two text exchanges? And why was *no* ESI produced from Bailey's company-issued phones?

Defendants attempt to deflect from their lack of evidentiary proof by arguing they could never show what exact information is lost because it is impossible to prove what they do not know. The court in *Friedman* contemplated this argument and summarily rejected it:

> We appreciate the quandary. But Rule 37(e) applies only to lost electronically stored information. There are situations, including one we recently reviewed, where the aggrieved party can show Rule 37(e) lost information through a "lost" attachment to a double deleted email when the parties can recover the email but not the attachment. We could also possibly find "lost" information if a witness testified of writing notes on a document produced by a third party but she fails to produce her copy of the same document with her notes. ***Absent some indicia of a lost document by a preponderance of the evidence***, we cannot morph Rule 37(e), and its specific adverse inference or dismissal sanction, into a general rule of discovery sanction.

2016 WL 6247470, at *8 (emphasis added). And even if Defendants had shown that *specific* relevant information existed on Plaintiffs' devices, they have not shown that such information is unavailable elsewhere (such as from the McLachlan supervisors on the other end of texts and phone calls with the Plaintiffs). *See, e.g., Air Products and Chemical v. Wiesemann*, 2017 WL 758417, *2 (D. Del. Feb. 27, 2017) (citing *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016)) ("Thus, a court cannot award sanctions when emails from one source has been lost, but the same emails are available from another source.").

### 3. Plaintiffs and Their Counsel Took Reasonable Steps to Preserve Relevant ESI

Rule 37(e) does not identify a standard for preservation. *Friedman,* 2016 WL 6247470, at *7. The duty to preserve arises from common law, and the test applied is whether litigation is pending or reasonably foreseeable. *Id.* Importantly, "a litigant is under no duty to keep or retain *every* document in its possession." *Dunn v. Mercedes Benz of Ft. Washington, Inc.*, 2012 WL 424984, at *5 (E.D. Pa. Feb. 10, 2012) (emphasis added). Rather, a litigant is "under a duty to

preserve what it knows, or reasonably should know, is relevant in the action ….” *Id.*

“Reasonableness is a fact specific determination.” *Friedman*, 2016 WL 6247470, at *7 And

while “[t]he obligation to preserve…requires reasonable and good faith efforts…it is

unreasonable to expect parties to take every conceivable step or disproportionate steps to

preserve each instance of relevant electronically stored information.” *The Sedona Conference,*

*The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for*

*Addressing Electronic Document Production* (2018) (Sedona Principle 5) [hereinafter *The*

*Sedona Conference*]. Plaintiffs’ and counsel’s preservation efforts were reasonable, made in

good faith, and proportional to the needs of the case given the limited role of ESI in either side’s

theory of the case.

  Both Plaintiffs and their counsel took reasonable steps to preserve evidence. First,

counsel sent preservation memos to each Plaintiff, describing their obligations with respect to

ESI. Thereafter, counsel sent follow-up letters, and had numerous conversations, with Plaintiffs

about preserving and collecting documents, including ESI, throughout the discovery period. In

response, Plaintiffs searched their phones and identified for counsel the three items of ESI that

were relevant: The Blankenship text, the Campbell text, and the callback list. Each of these items

was produced.

  At the core of Defendants’ argument is the assumption that Plaintiffs should have

expected to find more relevant ESI on their phones. But given the paucity of Defendants’ ESI

production, it is unclear what justifies this assumption. Yet, from this unjustified assumption,

Defendants presume that Plaintiffs were obligated to image all of their phones.  No such

obligation existed, because such an obligation is disproportional to the needs of this case. As one

court aptly stated: “A request to search the forensic image of a [electronic device] is like asking

to search the entire contents of a house merely because some items in the house might be relevant." *See Carlson v. Jerousek*, 68 N.E.3d 520, 537 (App. Ct. of Ill., 2d. Dist. 2016) (holding that forensic imaging as a discovery method must be bound by proportionality, and that the privacy interest of the plaintiff outweighed the value of the discovery). Plaintiffs are not sophisticated businesses or corporate executives—they are (or were) oil-rig laborers who joined a lawsuit for overtime wages. Plaintiffs could not have been expected to preserve ESI in the manner that Defendants now contend they should have. *See DVComm, LLC v. Hotwire Commc'ns, LLC*, 2016 WL 6246824, at *6 (E.D. Pa. Feb. 3, 2016) ("In evaluating preservation efforts, courts should be sensitive to the parties' sophistication with respect to litigation. Sophisticated parties are expected to have a higher degree of awareness of preservation obligations."); *see also The Sedona Conference* at Principle, cmt. 1(b) (noting that problems can occur when texts "roll off" a phone as memory is used up, that review costs for text can be exponentially high, and that "wholesale text message retention is regularly disproportionate for both sides of the litigation, e.g., in a wage and hour class action where employees use text messaging on their personal devices for work.").

Plaintiffs were never under an obligation to forensically image their phones. But the more basic fact is this: *Defendants never asked them to do so*. Or not, at least, until they sensed a tactical advantage in making that request in July of this year, after seeking two extensions of the discovery deadline. Defendants had many, many opportunities to request that Plaintiffs' phones be forensically imaged: at the Rule 26(f) conference, where local rules require such discussions to take place; in any of the 14+ emails and 5+ phone calls between counsel to negotiate search terms to be applied to *Defendants'* ESI a year ago; when Defendants served discovery responses; when Defendants wrote their first deficiency letter in December 2016; or at any other time

between the Rule 26(f) conference in August 2016, and when Defendants finally started asking

about ESI in April 2017. And of course, it was sensible for Defendants to *not* be focused on

Plaintiffs' ESI, considering that they, themselves, had only produced two text exchanges from

their six custodians. Considering the needs of this case, the sophistication of the parties, and,

most importantly *Defendants' own conduct*, it is clear that Plaintiffs took reasonable steps to

preserve ESI under Fed. R. Civ. P. 37(e) by manually reviewing their phones for relevant

messages.

**4.      Defendants Have Not Been Prejudiced by the Loss of Plaintiffs' Phones**

Defendants request curative measures under Fed. R. Civ. P. 37(e)(1), arguing that text

messages are "central to this case" and that they have been prejudiced in ways that they "cannot

know," because it is impossible to tell what evidence has been "discarded, destroyed, or

otherwise lost." (Defs' Br. at 13.) Defendants are wrong.

A finding of prejudice is a prerequisite for curative measures under Rule 37(e)(1).

*DVComm, LLC*, 2016 WL 6246824, at *6. As the party claiming prejudice from the lost ESI,

Defendants "must establish the facts warranting [the] findings under Rule 37(e) by a

preponderance of the evidence." *Id.* However, "[i]t is not enough for the innocent party to show

that the destroyed evidence would have been responsive to a document request. The innocent

party must also show that the evidence *would have been helpful in proving its claims or

defenses*—i.e., that the innocent party is prejudiced without that evidence. Proof of relevance

does not necessarily equal proof of prejudice." *Best Payphones, Inc. v. City of New York*, 2016

WL 792396, at *6 (E.D.N.Y. Feb. 26, 2016) (emphasis added).

Here, Defendants have not articulated any way in which some unnamed ESI from

Plaintiffs' phones could possibly help them mount a defense. As such, there can be no prejudice

here. *See Botey v. Green*, 2016 WL 1337665, at *7 (M.D. Pa. Apr. 4, 2016) (concluding that

plaintiff failed to demonstrate prejudice as other evidence relating to plaintiff's claims was

available and that even though the defendants were at fault for failing to preserve ESI, the failure

was a result of "carelessness" and did not rise to the level of culpability to justify sanctions).

Defendants' own actions prove they have not been prejudiced. If ESI and text messaging are

"central" to this case, why have Defendants only produced two text messages? If Defendants can

prove their defenses through text messages, as their Brief implies, where is that proof among the

scant ESI that they recovered from their custodians? The simple fact is that text messages play an

extremely minor role in this case, and Defendants are not prejudiced by the loss of some of

Plaintiffs' phones, most of which were in use after they no longer had any interaction with

McLachlan, except through this lawsuit.

### 5.   Plaintiffs Did Not Act Intentionally

In contrast to the curative measures allowed by Rule 37(e)(1), to impose any of the more

serious "specific sanctions" under (e)(2), "the court must find **_subjective_** intent. In other words, a

party must submit evidence of intentional destruction[.]" *DVComm, LLC*, 2016 WL 6246824, at

*6 (emphasis added). The intent requirement is "stringent" and "does not parallel other discovery

standards." *Moody v. CSX Transportation, Inc.*, 2017 WL 4173358, at *14 (W.D. N.Y. Sept. 21,

2017) (quoting *Jenkins v.* Woody, 2017 WL 362475, at *17 (E.D. Va. 2017), quoting in turn Fed.

R. Civ. P. 37(e)(2)). A showing of mere negligence, even gross negligence, will not support an

award of sanctions under Rule 37(e)(2). *Friedman*, 2016 WL 6247470 at *8; *see also Eshelman*

*v. Puma Biotechnology, Inc.*, 2017 WL 24983800, at *6 (E.D. N.C. Jun. 7, 2017); *Living Color*

*Enter. Inc. v. New Era Aquaculture, Ltd.*, 2016 WL 1105297 (S.D. Fla. Mar. 22, 2016) ("The

amended Rule 37(e) does not permit an adverse inference instruction or other severe sanctions

for negligence."); 2015 Advisory Comm. Notes to Rule 37(e). While a showing of prejudice is not required for the Court to impose sanctions under this provision of the rule, prejudice – or lack thereof – "may be considered in fashioning a remedy." *DVComm, LLC*, 2016 WL 6246824, at *6. "[C]ourts must be wary of issuing case-dispositive sanctions; such sanctions should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *Moody* at *15 (quoting *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 141 (S.D.N.Y. 2009)). *See also* 2015 Advisory Comm. Notes to Rule 37(e) ("Courts should exercise caution, however, in using measures specified in (e)(2). . . . The remedy should fit the wrong, and the severe measures . . . should not be used when the information lost was relatively unimportant or lesser measures . . . would be sufficient to redress the loss.").

Other courts have held that an intent to deprive may be found where: "(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." *Moody* at *15 (quoting *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017)). Indeed, the 2015 Amendments to Rule 37 "[do] not appear to have substantively altered the moving party's burden, in this Circuit, of showing that ESI was destroyed in 'bad faith' when requesting an adverse inference." *Accurso v. Infra-Red Services, Inc.*, 169 F.Supp. 3d 612, 618 n. 6 (E.D. Pa. 2016) (citing *Mead v. Travelers Indem. Co. of Connecticut*, 71 F. Supp. 3d 516, 518 (E.D. Pa. 2014, citing in turn *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 79 (3d Cir. 2012) ("A finding of bad faith is pivotal to a spoliation determination."))). Defendants' arguments in support of

"specific sanctions" under Rule 37(e)(2) are unpersuasive. Defendants fail to meet their affirmative evidentiary burden – they cannot show that a destructive intent is present here.

Defendants are unable to point to any affirmative act committed by Plaintiffs' that contributed to the disappearance of the (unspecified) information they believe is lost, let alone any done with the required intent. *See Accurso,* 2016 WL 930686 (denying a motion for sanctions, stating that the moving party failed to show that the non-moving party acted with intent); *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) Instead, Defendants argue that the circumstances surrounding a few of Plaintiffs' lost or stolen phones must somehow show Plaintiffs' intent to destroy. Defendants point to two examples: Bailey and Garder's flip phone, and Fuhs's phone to support this argument. The confusion over the location of Bailey and Gardner's shared flip phone is irrelevant: this phone was found, imaged, and found to lack any relevant messages. As for Fuhs's phone, it was taken while he was away from home and while his wife was accessing his home to remove her belongings during their divorce, and not before Fuhs searched the phone and provided his counsel with the relevant text exchanges. Again, this does not show intent. And though some of the Plaintiffs suffered lost or damaged phones, they did so in completely normal circumstances—e.g., getting a phone wet; breaking a phone while engaging in outdoor activities. This is not uncommon; indeed, consumers accidentally lose their phones approximately once a year.[8] Plaintiffs' experience with their phones is not even unusual, let alone sinister. This is a far cry from the intentionality required under Rule 37(e)(2). And

---

[8] Julia Vinyard, *Lookout Projects Lost and Stolen Phones Could Cost U.S. Consumers over $30 Billion in 2012*, BUSINESS WIRE, http://www.businesswire.com/news/home/20120322005325/en/Lookout-Projects-Lost-Stolen-Phones-Cost-U.S (last visited Oct. 18, 2017) (discussing a study of 15 million phone users conducted by Lookout, "the global leader in mobile security", in 2012 regarding phone loss across the United States).

because Defendants cannot make the intentionality showing, they are not entitled to the specific

sanctions of an unfavorable presumption, an adverse instruction, or dismissal.

> a.   This Case is Distinguishable from Cases in which "Specific Sanctions"
> Have Been Awarded

Courts have granted "specific sanctions" under Rule 37(e)(2), such as adverse

instructions and dismissal, only in cases with truly egregious, intentional conduct. A survey of

relevant cases shows that this case's facts and procedure pale in comparison to the behavior of

parties who receive these most drastic forms of punishment.

Defendants rely heavily on *Kvitka v. Puffin Co., LLC*, to support their argument that

"specific sanctions" under Rule 37(e)(2) are warranted in this case. 2009 WL 385582 (M.D. Pa.

Feb. 13, 2009). The facts in *Kvitka* are easily distinguishable from this case. First, the dispute in

*Kvitka* centered on allegedly disparaging emails and their origin. *Id.*, at *1 (stating that Plaintiff

admitted in a letter to counsel prior to the litigation that, "Apparently, this entire thing has a lot to

do with some emails."). But Plaintiffs' claims in this case have little or nothing to do with text

messages or other ESI.

What's more, Plaintiff's conduct in *Kvitka* was egregious; nothing like the innocent

conduct of the Plaintiffs in this case. In *Kvitka*, plaintiff's bad acts includes admitting she threw

her laptop computer in the trash even after consulting with a computer technician, failing to

inform a judge of the whereabouts of emails when asked directly, beginning a new lawsuit based

upon the emails contained on the laptop she disposed of despite knowing the device was gone,

giving an absurd explanation under oath when asked how files appeared on her new laptop from

the disposed of laptop when her testimony was that no data had been transferred, and

substantively changing deposition testimony and interrogatory answers, among other things. *Id.*

at *2-*4.  The plaintiff in that case committed bad act after bad act in a case where the existence

and content of her emails were the cornerstone of her lawsuit. This is not that case.

Similarly, this case is also distinguishable from  that in *DVComm*, *LLC* where the Court

declined to dismiss the case and instead issued only an adverse inference, calling it "the most apt

and narrowly tailored sanction for the permanent destruction of [ ] central ESI[.]" 2016 WL

6246824, at *8. Like in *Kvitka*, ESI was central to the *DVComm, LLC* case. *Id.* at *5

(determining that the Court had no ability to evaluate the merits of DVComm's claim for breach

of a non-disclosure agreement because of a deleted electronically-maintained draft of a

confidential business plan). Also like in *Kvitka*, the spoliating party took affirmative action to

destroy information by, among other things, "double deleting" emails with relevant attachments.

*Id.* at *4-*5. And yet, even after finding a clear intent to destroy on the part of the spoliating

party, the Court sought a narrowly tailored solution. *Id.* at *8. This case lacks two key features of

*DVComm*: Plaintiffs who have acted with intent, and ESI that is central to the case. The Court

should look to these distinctions as instructive, and should properly reject an adverse inference as

an outcome to this motion.

**B.**     **Plaintiffs' Counsel Should Not be Sanctioned Under Rule 26(g).**

Rule 26(g) imposes a certification requirement that "obliges each attorney to stop and

think about the legitimacy of a discovery request, a response thereto, or an objection." Advisory

Committee Note to 1983 Amendment; Federal Rule of Civil Procedure 26(g). "Rule 26(g) does

not require perfection and does not impose an unreasonably high burden on litigants." *Younes v.*

*7-Eleven, Inc.*, 312 F.R.D. 692, 706–07 (D.N.J. 2015). Rather, Rule 26(g) "simply requires that

the attorney make a reasonable inquiry into the factual basis of his response, request, or

objection." Advisory Committee Note to 1983 Amendment. Whether the inquiry is reasonable is

an objective standard. *Id.* Defendants' request for sanctions under Rule 26(g) should be denied; no admonition or reprimand should issue.

### 1.  Plaintiffs reasonably handled and disclosed Plaintiff Bailey's recordings, making sanctions under Rule 26(g) inappropriate.

Defendants argue that Plaintiffs were required to disclose the Plaintiff Bailey's recordings in their Rule 26 initial disclosures. Rule 26(a)(1)(A)(ii) requires that a party disclose documents, electronically stored information, and tangible things that the party "may use *to support* its claims or defenses." (Emphasis added.) Plaintiffs did not reference the recordings in their initial disclosures because Plaintiffs did not intend to use them to support their claims. Citing to *Patel v. Havana Bar, Restaurant & Catering*, Defendants argue that Plaintiffs' exclusion of recordings from their initial disclosures violates the requirements of Rule 26(g). No. 10-1383, 2011 WL 6029983 (M.D. Pa. Dec. 5, 2011) *Patel* is inapplicable; it does not even mention of Rule 26(g). *Id.* The Court should deny sanctions under Rule 26(g). *Bracey v. Harlow*, No. 1:11-CV-4-SJM-MPK, 2013 WL 2253576, at *2 (W.D. Pa. May 22, 2013) (denying sanctions on initial disclosures).

While hindsight may suggest that counsel could have acted more promptly, the decisions at hand were a serious matter, and counsel acted reasonably in his decision to withhold the recordings for a reasonable period of time in discovery responses. The Court is well aware of the issues surrounding the legality of the recordings, and the possible implications for Bailey. Determining the proper way to handle these recordings required counsel to discuss the facts and circumstances with Bailey, the firm's ethics partner, and a Pennsylvania attorney; and research Pennsylvania law, the professional obligations to both client and tribunal, and whether the recordings could be withheld on 5th Amendment grounds. Bailey's discovery responses were

served in March; his recordings were served in April. The modest delay in producing the recordings, and producing them well in advance of Bailey's deposition, was reasonable.

### 2. Defendants have failed to show that Sanctions under Rule 26(g) are appropriate to the alleged misconduct of which they complain.

Defendants tact here is to refer to a general, grossly mischaracterized "discovery approach" taken by Plaintiffs, as a basis for sanctions. (Defs' Brief at 31.) Rule 26(g) does not allow for such sweeping sanctions. Rule 26(g) is specific to the certification of discovery requests, responses, or objections.[9] Sanctions, particularly of the severity that Defendants call for (formal admonition, as but one example), are not warranted because counsel's approach is "substantially justified." Fed. R. Civ. P. 26(g)(3).

The overreaching of Defendants' argument is illustrated by the cases they cite in their brief. *See Younes v. 7-Eleven, Inc.*, 312 F.R.D. 692 (D.N.J. 2015); *Cmty. Ass'n Underwriters of Am., Inc. v. Queensboro Flooring Corp.*, No. 10-cv-1559, 2014 WL 3055358 (M.D. Pa. July 3, 2014). In both cases, sanctions are limited to violations of Rule 26(g) in regards to specific responses to interrogatories. In *Underwriters*, the court issued sanctions under 26(g) where a party made a false certification and unequivocally denied the existence of recordings in response to specific and explicit interrogatories, and then destroyed those recordings. *Cmty. Ass'n Underwriters of Am., Inc.*, 2014 WL 3055358, at *8. In *Younes*, certain 7-Eleven franchisees alleged that they had been wrongfully targeted for termination, and that this effort was referred to by various names, including "Project P." *Id.* at *2. 7-Eleven denied the existence of any such project in their certified answer of two interrogatories explicitly seeking that information. *Id.* After years of discovery, it came to light that Project P was a multi-million dollar project at 7-

---

[9] Defendants attempt to argue that sanctions under Rule 26(g) are appropriate for alleged deposition misconduct. Rule 26(g), however, does not apply to "deposition tactics," and Defendants do not cite any legal authority for that proposition.

Eleven, which involved multiple employees. What's more, 7-Eleven's defense counsel was involved in the implementation of Project P, and had full knowledge of the project throughout litigation. Project P was not only imperative to the claims of the case, but included a substantial number of documents and multiple witnesses that were not disclosed for years into litigation, despite the explicit request for such information through two interrogatories. *Id.* The facts in this case are nothing like those of *Younes* or *Underwriters*, and sanctions should not issue.

Finally, sanctions are not appropriate under Rule 26(g) if the "offending conduct is harmless." *Younes* at 703; *see, e.g.*, *Bracey*, 2013 WL 2253576, at *2 (denying sanctions because there was not a pattern of obstruction and because the plaintiff was not harmed by any inaccuracies in defendant's initial discovery responses). Defendants have not been harmed by the modest delay in producing the recordings. Defendants' motion for sanctions should be denied.

**C.**   **Plaintiffs' Counsel Should Not be Sanctioned for Conduct at the Fuhs Deposition**

Finally, Defendants argue that counsel's conduct in defending the Fuhs deposition was part of their "disdain for fair play." Defs' Br. at 27. Attorney Matthew A. Frank defended Fuhs at his deposition. Ex. OO ¶ 7. In his experience practicing in Minnesota, it is customary and proper to confer with clients during deposition breaks—without coaching them on what to say—in order to make sure the record is accurate. *Id.* ¶ 9. Likewise, it is standard to assert attorney-client privilege with respect to such communications. *Id.* Before the day of Fuhs's deposition, Attorney Frank had not defended a deposition outside of Minnesota. *Id.* ¶ 7.

Defendants repeatedly claim to have "repeatedly" asked Fuhs to recount every conversation he'd had with his father "pertaining to the lawsuit." Dkt. 51 at 27–30. This is false. While Defendants asked Fuhs about discussions with his father, the scope of the questions and answers were much narrower. *See, e.g.*, Ex. E at 33:11-14, 33:15-20, and 33:21–34:1.

Near the end of the deposition, on redirect and with no questions pending, Attorney Frank asked opposing counsel *on the record* for permission to take a "one-minute break." *Id*. at 112:1-4. He made no effort to conceal or obfuscate the purpose of the break, which was to talk to his client to clarify whether the record was accurate.  *Id.*; *see also* Ex. OO ¶ 10. Opposing counsel replied, "Sure." Ex. E at 112:5. Accordingly, during a very short break, Attorney Frank did exactly what he said he was going to do—and he did so without feeding his client information or seeking to influence his testimony. Ex. OO ¶¶ 8-9. Following the break, Fuhs clarified his testimony regarding conversations he'd had with his father relating to Plaintiffs' claims generally (if not specifically to *his* claims). Ex. E at 112:6–113:24.[10]

Upon receiving the witness back, counsel sought to invade attorney-client privilege. *Id.* at 114:4-7. Attorney Frank objected in good faith and asked if counsel wanted to discuss the issue. Ex. E at 114:9-11; *see also* Ex. OO at ¶¶ 11-12. Counsel just continued interrogating Fuhs. Ex. E at 114:12-17. Again, Attorney Frank asked to "pause for half a second" in hopes of conferring. Ex. E at 114:24–115:3; Ex. OO at ¶ 12. The response: "No." *Id.* Ultimately, counsel rejected a third offer to meet and confer. Ex. E at 119:5-25. Despite the privilege objections, Fuhs repeatedly testified that he—not counsel—remembered the facts in question. *Id.* at 114:24–116:15, 120:1-12, and 122:2–123:1.

Still, after the deposition, Attorney Frank immediately contacted two partners at Nichols Kaster, including the firm ethics partner, to make sure his understanding of proper attorney-client communications and assertions of privilege during depositions was correct. Ex. OO ¶ 13. They confirmed his experience, but advised researching potential differences in the Western District of

---

[10] His clarification tracks deposition testimony from others who had separate contemporaneous conversations with Fuhs's father or another Shell employees Brett McCoy. *Compare* Ex. G, Gardner Dep. at 19:8-22 and 66:3-67:7; Ex. K, Roe Dep. at 79:19–80:8.

Pennsylvania. *Id*. The next business day, Attorney Frank emailed opposing counsel asking whether he believed the privilege issue required further attention. Ex. F.

A month later, after reviewing the transcript, Defendants demanded that "plaintiffs … be barred from introducing evidence … of the alleged events that were described by the witness after the break" and contemplated the possibility of a second deposition. *Id.*; Ex. PP. In response, Plaintiffs agreed to coordinate a remote deposition of Fuhs regarding the one-minute break. Ex. QQ. Defendants never responded.

Sanctions are not warranted here. In *Vnuk v. Berwick Hospital Co.*, counsel defending a deposition was accused of various improprieties, including conferring with his client during breaks. 2016 WL 907714, at *1 and *5 (M.D. Pa. March 2, 2016). When asked about these discussions, the deponent refused to answer at the instruction of counsel. *Id.* The parties then reviewed the controlling precedent in *Hall v. Clifton Precision*, 150 F.R.D. 525 (E.D. Pa. 1993). *Id.* But defending counsel was unmoved and continued asserting the privilege. *See generally id.* Counsel taking the deposition was forced to move to compel compliance with *Hall*. The court granted the request, but declined to award even a modest sanction of attorneys' fees. *Id.* at *5–6.

Sanctions are even less warranted here. First, Fuhs testified that he was the person who remembered the relevant facts. Second, Attorney Frank explicitly asked for and received Defendants' permission to take a break to clarify the record. There was no hiding the ball. Third, Defendants did not offer to discuss the issue, much less did they provide Attorney Frank with an opportunity to view relevant precedent.[11] Instead, they chose to stymie his repeated attempts to meet and confer.

---

[11] Here, the contrast with *Vnuk* is particularly striking. Unlike Attorney Frank, the attorney defending the deposition in *Vnuk* was local to Pennsylvania and had been practicing for nearly three decades. Ex. H; Ex. OO at ¶¶ 3-7.

Finally, unlike *Vnuk*, Defendants were not forced to make a motion to compel here. Counsel contacted them the next business day to resolve any differences and later offered a second deposition. But Defendants simply preferred to move for sanctions and a formal reprimand instead. Attorney Frank sought to protect attorney-client privilege in good faith; he repeatedly sought to meet and confer during the deposition; and he attempted to remedy any purported prejudice as soon as practicable afterward. This is not the conduct of someone who disdains fair play. It is the opposite.

## V.   **CONCLUSION**

This motion for sanctions is nothing more than a poorly disguised attempt to gain tactical advantage, and should be summarily denied.


DATE: October 23, 2017

s/Charles A. Delbridge
James H. Kaster (MN Bar #53946)
Matthew A. Frank (MN Bar #0395362)
Charles A. Delbridge (MN Bar #389639)
4600 IDS Center
80 South 8th Street
Minneapolis, MN  55402-2242
Telephone: 612.256.3200
Email: kaster@nka.com
        fisher@nka.com
        mfrank@nka.com
        cdelbridge@nka.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October 2017. A true and correct copy of the foregoing

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION

FOR SANCTIONS was filed using the Western District of Pennsylvania's CM/ECF system,

through which this document is available for viewing and downloading, causing a notice of

electronic filing to be served upon the following counsel of record:

Robert W. Pritchard
Jill M. Weimer
Sarah J. Miley
Brittany Fink
Niloy Ray
Littler Mendelson, P.C.
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222

*Counsel for Defendants*

s/Charles A. Delbridge
Charles A. Delbridge