**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ERIC FUHS, JEFFERY BAILEY, WILLIAM LAFLEUR, DARYL GARDNER, and HAROLD ROE,
Plaintiffs,

v.

MCLACHLAN DRILLING COMPANY and JAMES E. MCLACHLAN,
Defendants.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 16-376

Judge Nora Barry Fischer

**<u>MEMORANDUM OPINION</u>**

I.      INTRODUCTION

This Fair Labor Standards Act, ("FLSA"), retaliation case is brought by five former solids control technicians for Defendant McLachlan Drilling against the company and its owner, Defendant James McLachlan, (collectively, "Defendants"). (Docket No. 1). Plaintiffs Eric Fuhs, Jeffrey Bailey, William LaFleur, Daryl Gardner and Harold Roe claim that they were retaliated against for joining and/or participating in the settlement of the wage and hour lawsuit captioned *Stroman v. McLachlan Drilling Company* at Civil Action No. 15-237, (hereinafter "*Stroman*"). (*Id.*). Presently before the Court is a motion for sanctions filed by the Defendants which is opposed by Plaintiffs. (Docket Nos. 50; 60). The matter has been exhaustively briefed and argued by the parties. (Docket Nos. 50-51; 59-60; 63; 64; 71-72). To this end, the Court has received and considered the parties' pre-hearing briefing, (Docket Nos. 50-51; 59-60; 63; 64), oral argument presented at a motion hearing and the transcript of same, (Docket No. 70), as well as post-hearing supplemental briefing, (Docket Nos. 71; 72). After careful consideration of the parties' positions in light of all of the evidence of record, and for the following reasons, Defendants' Motion [50]

1

has been granted, in part and denied, in part. The Court now writes in support of its earlier Order. (Docket No. 73).

## II.     BACKGROUND

### A.   *Stroman Lawsuit – CA 15-237*

A class and collective action complaint was filed in the *Stroman* matter on February 19, 2015 alleging that McLachlan Drilling's day rate compensation system for its solids control technicians violated both the FLSA and the Pennsylvania Minimum Wage Act because the employees were not paid overtime for work performed in excess of forty (40) hours per week. (Civ. A. No. 15-237, Docket No. 1). Five individuals filed opt-in notices to join the *Stroman* suit, including Roe. (Civ. A. No. 15-237, Docket No. 6). The case was quickly resolved as the lawyers from Nichols Kaster[1] and Littler Mendelson[2] worked together harmoniously to settle the case without court intervention and prior to the commencement of formal discovery or any litigation. In this regard, the Court granted the parties' joint motion to stay on April 2, 2015 and approved the settlement on July 20, 2015 after reviewing the parties' joint motion, supporting brief and exhibits.[3]  (Civ. A. No. 15-237, Docket Nos. 10; 13; 16-22). After the case was settled, notice was sent to other solids controls technicians employed by McLachlan Drilling and many joined at that time, including Fuhs, Bailey, LaFleur and Gardner. A stipulation of dismissal was submitted on October 1, 2015 and the case was closed the following day. (Civ. A. No. 15-237, Docket Nos. 23; 25).

---

[1]     Michelle Fisher, Esq. and Ashley Thompson, Esq. of the wage and hour division of Nichols Kaster represented Plaintiffs. (*See* Docket Report, Civ. A. No. 15-237).

[2]     Jill Weimer, Esq.; Robert Pritchard, Esq.; and Sarah Miley, Esq. represented Defendant. (*See* Docket Report, Civ. A. No. 15-237).

[3]     The case was reportedly settled for $857,500.00. (Civ. A. No. 15-237, Docket No. 21-2). According to the provided allocation information, after deducting attorneys' fees: Daryl Gardner was to be paid $22,037.18; Eric Fuhs was to be paid $16,199.93; Harold Roe was to be paid $25,189.03; Jeff Bailey was to be paid $7,959.67; and Bill Lafleur was to be paid $7,076.20. (Civ. A. No. 15-237, Docket No. 21-2).

### *B. Plaintiffs' Work History with Defendant / Retaliation Claims*

Roe worked for McLachlan as a senior solids control technician near Mansfield, Pennsylvania from around September 2011 through April, 2015. (Docket No. 1 at ¶¶ 21-23). Roe filed a consent to join the *Stroman* lawsuit on March 19, 2015. (*Id*. at ¶ 26). He was laid off in April of 2015 at the end of his two-week "hitch" and not called back to work. (*Id*. at ¶¶ 27-29).

The remaining plaintiffs joined in the settlement of *Stroman* around September or October of 2015. (*Id*. at ¶¶ 47, 65, 79, 98). Bailey, LaFleur and Fuhs all worked for Defendant near Uniontown at the Chevron rig. (*Id*. at ¶¶ 40, 61, 77). The rig was shut down for a short time and they were not called back to work after the rig was reopened. (*Id*. at ¶¶ 56, 66-67, 80-83). Gardner worked for Defendant near Wellsboro, Pennsylvania. (*Id*. at ¶ 89). Gardner was called back to work briefly in a lesser role for a short period of time but ultimately let go by the company. (*Id*. at ¶¶ 102-105).

In addition to the timing of the employment decisions vis-à-vis their joinder in the *Stroman* lawsuit/settlement, Plaintiffs have developed significant evidence of retaliation during discovery. (*See* Docket No. 60 at 4-5). First, non-party and former McLachlan operator Greg Thornberry, states in his affidavit that he believes that the Plaintiffs were retaliated against for participating in the lawsuit. (Pl. Ex. A ¶ 7.2, Docket No. 59-1). Among other things, Thornberry provides the following examples of retaliatory conduct:

- McLachlan Field Superintendent Dan Campbell, Defendants' second in command, [told] employees, including Gardner, that [those individuals] who joined *Stroman* [were] a "bunch of niggers." (Ex. A ¶ 4.)
- McLachlan Field Supervisor Levi Hulliberger threaten[ed] to "kick [the] ass" of anyone that joined *Stroman*. (Ex. A ¶ 3.)
- McLachlan treat[ed] plaintiff Roe badly: laying him off right before his hitch was supposed to start and soon after he joined *Stroman*, while letting others stay on the job longer. (Ex. A ¶ 6.)
- Craig McLachlan suddenly [froze] employees out of work-related social situations after they joined *Stroman*. (Ex. A ¶ 5.)

(Docket No. 60 at 4). Second, each of the Plaintiffs testified as to their own experiences observing

retaliatory acts and comments. For example, Gardner explained that:

- Field Superintendent Campbell referred to potential *Stroman* participants as "niggers" and "lowlifes". (Pl. Ex. G at 15:16-16:20, Docket No. 59-7);
- Defendants' second-in-command and field supervisors regularly talked about the ramifications for employees who participated in *Stroman*, including threats of termination, and, on at least one occasion, physical violence. (Pl. Ex. G at 15:14-16:20, 23:4-24:7, 61:7-20, Docket No. 59-7);
  o Defendant James McLachlan called Roe "worthless" and a "piece of shit" because he joined *Stroman*. (Pl. Ex. G at 66:13-16, 37:18-38:8, Docket No. 59-7);
- Craig McLachlan said *Stroman* participants were stealing McLachlan's money. (Pl. Ex. G at 18:35-19:12, Docket No. 59-7);
- Field Supervisor Jon Mio said *Stroman* participants "know what they're in for." (Pl. Ex. G at 43:10-20, Docket No. 59-7);
- Field Supervisor Levi Hulliberger called *Stroman* "bullshit," and said he "wanted to go to everybody's houses that signed up on the lawsuit and beat their ass or punch them in the face." (Pl. Ex. G at 23:4-8; 61:7-20, Docket No. 59-7)

(Docket No. 60 at 4-5). Similarly, according to Fuhs, Field Supervisor Joel Lohrer told him that

James McLachlan threatened in a meeting to get rid of employees who joined *Stroman*. (Pl. Ex.

E at 10-12, Docket No. 59-5). Third, two text messages produced by Defendants lend additional

support for Plaintiffs' retaliation claims. In this regard, Lohrer wrote in a text message to "Donnie"

that "we got sued by our employees, my boss is hateful now." (Pl. Ex. L, Docket No. 59-12).

Lohrer confirmed that the lawsuit was about "the day rate thing" and called the employees "greedy

fuckers." (*Id*.). Fourth, Dan Campbell admitted that he told Bailey that he "couldn't believe" that

he joined *Stroman* and that he was "disappointed" in him. (Pl. Ex. M, Docket No. 59-13). Fifth,

two versions of a call back list pre- and post-*Stroman* suit have been discovered, with the second

version omitting individuals who had joined *Stroman*. (Pl. Exs. B; C, Docket Nos. 59-2, 59-3).

    *C. Discovery*

On March 20, 2015, the day after Roe filed his consent to opt-in to the *Stroman* case, his counsel sent him a litigation hold letter. (Pl. Ex. N, Docket No. 59-14). Among other things, counsel instructed Roe to preserve e-mails and other electronic records related to the lawsuit and that he could not "delete or destroy any electronic communications, including email messages, text messages, and social media posts (e.g., Facebook, LinkedIn, Twitter, etc.) related to this lawsuit." (*Id.*). Bailey, Gardner, LeFleur and Fuhs did not receive a litigation hold letter in *Stroman* because they joined the settlement <u>after</u> the case was resolved and were <u>not</u> parties to the litigation. (Pl. Ex. D at ¶ 19, Docket No. 59-4). Nichols Kaster received reports of retaliation from some of the individuals involved in *Stroman* and sent correspondence to lawyers at Littler Mendelson including a cease and desist letter in April as to Roe and an email and letter in October of 2015 as to a number of the individuals involved in *Stroman*. (Pl. Exs. F-G, Docket Nos. 51-6; 51-7). The October 2, 2015 email correspondence included many of the allegations which were ultimately set forth in the Complaint filed in this case:

> [W]e are hearing from several of our clients about retaliation. Initially, for example, we heard that people were concerned about signing up because the word was that Jimmy McLachlan was telling people he would find a way to permanently lay off those who participated. We have heard this from at least 6 people. From additional people we have reports, for instance, that (1) Jimmy called Eric Fuh's father saying if he forgives Eric for joining the suit he will only hire him back for less pay, (2) Jimmy and a manager said they will fire those who participate in the lawsuit, (3) McLachlan is laying off Settling Plaintiffs and replacing them with less senior people who did not join, (4) McLachlan is withholding paychecks from Settling Plaintiffs such as Stone and Reid, and (5) McLachlan laid off Harold Roe for joining the case.

(Pl. Ex. F, Docket No. 51-6 at 2). The October 14, 2015 letter further detailed the same types of allegations:

> Dear Counsel:

I am writing to follow up our recent conversations about the complaints of retaliation we have been receiving from our clients. You indicated that the issue was addressed with Mr. McLachlan; however, we continue to get calls from our clients with complaints of continuing retaliation. Some of the specific complaints are detailed below, but in general, it appears that McLachlan is laying off current employees who have accepted the settlement and replacing them with 1) less senior-individuals who did not join the suit, 2) out-of-state workers, and/or 3) former workers who have not worked for McLachlan for a number of years. At least eleven (11) of the fifteen (15) current employees who joined the lawsuit have been laid off.

First, it is worth noting that since the inception of the suit, we have received numerous reports of rumors that McLachlan was telling its employees that they would be laid off and/or not called back if they joined the suit. We reached out to you about Harold Roe's lay off back in April and were assured that this was due to a lack of work. Mr. Roe has not been called back since and others have been hired instead. Then, during the settlement notice period, we learned of direct conversations Mr. McLachlan and/or his supervisors had with various employees threatening their jobs if they joined the suit. We assured our clients that such action was prohibited and would not be tolerated.

Since the close of the settlement period, we have learned of the following complaints:

1. Jeff Bailey, Bill LaFleur, Eric Fuhs, Matt McGuigan, Brad Stone, Daryl Gardner, Greg Thornberry, Michael Castillo, and Jon Reid were laid off the beginning of October and have since received COBRA notices in the mail.

None have been called back to their rig since your conversation with Mr. McLachlan, and some have since received confirmation that they are laid off until further notice. Others have been told they are being transferred to a temporary rig and will be laid off again in two weeks. Many of these guys have been with the company for years and have never been laid off before. They are now being replaced by other, less senior or out-of-state individuals who did not join the suit.

2. Mr. McLachlan called Mr. Fuhs' father and told him that Mr. McLachlan forgave Mr. Fuhs for joining the suit and would hire him back for less pay.

3. Mr. Stone and Mr. Reid did not get paid on the last pay day. They did not receive their checks until days after complaining.

4. Dennis Reffitt, who has been laid off and called back a few times in the past, has not been called back since accepting the settlement. Likewise, Dennis's son, Kyle, has not been called back since Dennis joined the suit.

These actions are alarming, particularly given Mr. McLachlan's previous threats about terminating employees involved in the suit. We ask that you please address these issues again with your client and ensure that such retaliation comes to an end immediately and these issues are resolved. If it does not, the company will likely face legal action for retaliation. Please advise.

(Pl. Ex. G, Docket No. 51-7). Counsel for the parties also conferred on October 30, 2015 in an effort to resolve the retaliation issues/concerns. (Pl. Ex. D, Docket No. 59-4 at ¶ 23).

Around this time, several of the Plaintiffs had discussions concerning ESI with attorneys at Nichols Kaster. (Pl. Ex. D., Docket No. 59-4 at ¶¶ 24-26). To this end, Bailey advised Nichols Kaster that he had audio recordings related to possible retaliation on October 1, 2015 and, per his attorneys' directives, Bailey sent the recordings to the law firm, which received them on November 10, 2015. (*Id*. at ¶ 24). Fuhs informed his counsel on October 27, 2015 that he had text messages related to possible retaliation and he forwarded those texts to the firm around that time. (*Id*. at ¶ 25). Thereafter, Bailey sent a cell phone picture of the callback list to his counsel on January 28, 2016. (*Id*. at ¶ 26).

The five Plaintiffs signed engagement letters with Nichols Kaster to represent them in this lawsuit in February of 2016. (Pl. Ex. O, Docket No. 59-15 at ¶ 4 ("February 17 (as to Fuhs), February 22 (as to LaFleur), and February 29 (as to Bailey, Roe and Gardner)")). This case was filed then on March 31, 2016. (Docket No. 1). A week later, counsel sent each of the plaintiffs a litigation hold letter which stated "[p]lease pay special attention to electronic data and electronic records . . .[which] may be located in places you might overlook or not ordinarily think of as containing 'documents […]' … [such as] cell phones." (Pl. Ex. Q, Docket No. 59-17). Counsel sent a follow-up letter to Plaintiffs on August 16, 2016, and asked them to "gather […] any documents (including emails or text messages) that you have in your possession related to your employment with McLachlan." (Pl. Ex. R, Docket No. 59-18). This was also the date of the

parties' Rule 26(f) conference, which counsel avers included a discussion of ESI among counsel and e-discovery specialists for both sides. (Pl. Ex. O, Docket No. 59-15 at ¶ 10). The parties' Rule 26(f) Report states that they were seeking ESI, including metadata, the format for production, and that the parties had "identified custodians who may be in possession of relevant electronic data, and have agreed to identify a set of search terms that will be used to search relevant databases."[4] (Docket No. 17). The parties also reported <u>no</u> issues pertaining to the preservation of ESI. (*Id.*). The record is undisputed that the discussion at the Rule 26(f) conference focused on <u>Defendants' custodians</u> and relevant search terms as to same. (Pl. Ex. O, Docket No. 59-15). Plaintiffs' Rule 26(a)(1) disclosures were served on September 13, 2016 and made no mention of electronically stored information, ("ESI"). (Docket No. 71-2).

The Court held a case management conference on September 21, 2016. (Docket No. 23). Plaintiffs' counsel Mr. Delbridge appeared in person and the individual plaintiffs participated by telephone. (*Id.*). Defense counsel Robert Pritchard, Esq. and Sarah Miley, Esq. as well as Defendant James McLachlan appeared in person. (*Id.*). The case management conference was not transcribed. (*Id.*). However, as is the Court's typical practice, the Court addressed the individual plaintiffs, asked a series of background questions and also informed them about their duties to turn over emails, social media accounts and other electronic documents about the case to their counsel as they may be subject to discovery. No specific issues as to ESI were brought to the Court's attention during the case management conference. (*Id.*). The parties requested no significant deviations from the standard case management order. There was a dispute as to the

---

[4]     The Court notes that the Rule 26(f) Conference was held prior to the Court's November 1, 2016 release of its Checklist for Rule 26(f) Meet and Confer Regarding Electronically Stored Information; Guidelines for the Discovery of Electronically Stored Information; and the Model Stipulated Order re: Discovery of Electronically Stored Information. *See* Appendix LCvR 26.2.C-Checklist; Appendix LCvR 26.2.C-Guidelines; and Appendix LCvR 26.2.E.-Model Order. The Court recommends that litigants utilize these tools in all civil matters where ESI is sought.

number of interrogatories after the conference, with the parties advising in a Joint Status Report filed on September 28, 2016 that the matter had been resolved. (Docket No. 26). The Case Management Order reflects that Rule 26(a) disclosures had been made by the parties and directed that fact discovery was to end on April 28, 2017. (Docket No. 25). The case was then referred to Carole Katz, Esq. for mediation, as the parties agreed. (*Id.*).

On September 30, 2016, Defendants served written discovery on Plaintiffs including interrogatories and requests for production. Relevant here, Defendants sought the following:

> INTERROGATORY NO. 2: Identify (by description and location) all documents electronically stored information, and tangible things in your possession, custody or control that pertain to any of the allegations contained in your Complaint.

> INTERROGATORY NO. 9: Identify all email accounts, email addresses, social media accounts (including but not limited to, LinkedIn, Facebook, Instagram, MySpace), and social media communications (including but not limited to Twitter or blogs) that you have used since January 1, 2015, and identify the steps you took to preserve the information on these accounts, including the date you took those steps.

> REQUEST FOR PRODUCTION NO. 10: All calendars, notebooks, diaries, logs, correspondence, e-mail messages, text messages, voice mail messages, social media communications or posts, computer disks or other documents reflecting or relating to any of the claims alleged in your Complaint.

(Pl. Ex. O, Docket No. 59-15 at ¶¶ 15-16). After receiving this written discovery, Plaintiffs' counsel wrote to each individual plaintiff on October 6, 2016, asking for information to respond to the discovery requests including "email messages, text messages or social media posts relating to this lawsuit." (Pl. Ex. O, Docket No. 59-15).

Between October 28 and November 11, 2016, Counsel for the parties engaged in significant negotiations regarding search terms to be utilized in the review of the ESI obtained from Defendants' six custodians, who included McLachlan, Campbell and Bailey. (*Id.*). Although more

than 183,000 items of ESI were collected from Defendants' custodians' phones, Defendants produced only 2 text messages to Plaintiffs and refused to identify the individuals associated with such messages.[5] (Pl. Ex. O at ¶ 20-22, Docket No. 59-15). No messages were produced from McLachlan or Campbell's cell phones or Bailey's company-issued phone. (*See* Pl. Ex. L, Docket No. 59-12).

The parties mediated with Carole Katz, Esq. on November 15, 2016 but the case was not resolved. (Docket No. 31). When the Plaintiffs were in Pittsburgh for the mediation, Plaintiffs' counsel met individually with each Plaintiff to discuss the discovery requests in more detail. (Pl. Ex. O at ¶ 26, Docket No. 59-15). Through these discussions, counsel learned that there were likely three relevant pieces of ESI in Plaintiffs' possession, including a text exchange between Fuhs and a coworker about his job status in October 2015 which was referenced in the Complaint; a text exchange between Fuhs and Campbell about Fuhs' job status in late October 2015; and a photo of a McLachlan employee list used to call people back to work and from which plaintiffs had been removed after joining *Stroman*. (*Id.* at ¶ 27). All of these items had been previously provided to the firm. Current counsel had a difficult time finding these documents and had to contact the prior lawyer at the firm. (*Id*. at ¶¶ 29-30). Counsel represents that each of these documents were then produced prior to Plaintiffs' depositions. (*Id*. at ¶ 30).

Plaintiffs Fuhs, Gardner, LaFleur and Roe served their responses to interrogatories on Defendants and Gardner, Roe and LaFleur responded to document requests on November 14, 2016.[6] (Pl. Ex. O at ¶ 24, Docket No. 59-15). They lodged general objections[7] and provided some

---

[5]      The Court notes that the fact that Defendants refused to identify the phone numbers associated with the text messages was not brought to the Court's attention.

[6]      As is noted in the body of this Opinion, Defendants attached excerpts of the responses by Fuhs and Bailey to their initial motion and brief in support but not the others.

[7]      As is explained below, the use of general or boilerplate objections is disfavored. *See* § IV.B.2.a., *infra*.

of the requested information including email addresses and whether the plaintiffs maintained social media accounts. They did not mention ESI or text messages. On December 14, 2016, Defense counsel Jill Weimer, Esq. wrote to Plaintiffs' counsel regarding deficiencies in the discovery responses. (Pl. Ex. V, Docket No. 59-22). The letter noted inadequate responses with respect to Plaintiffs' employment and medical records, other lawsuits and criminal records. (*Id*.). The letter is detailed but notes only the following with respect to ESI:

> Plaintiff Eric Fuhs did not provide any documents in response to Defendants' First Set of Document Requests. Please confirm whether Fuhs has any documents that are responsive to Defendants' First Set of Documents and if so, please let Defendants know when we will receive Plaintiff Fuhs' responses to Defendants' First Set of Document Requests. Defendants are particularly interested in the status of all requested ESI, including text messages.

(Docket No. 59-22). The letter made no other mention of deficiencies. Plaintiffs' counsel Mr. Delbridge responded in a letter dated January 26, 2017. With respect to the Fuhs documents, he stated simply that "Mr. Fuhs will produce responsive documents on or before February 3, 2017 (excepting, perhaps, those medical records referred to above; discovery is continuing)." (Pl. Ex. W, Docket No. 59-23). No evidence of a further conferral between counsel at this time.

On February 21, 2017, the Court ordered that a Joint Status Report be filed by March 6, 2017. (Docket No. 32). In response, the parties filed the Joint Status Report which is signed by Mr. Delbridge and Ms. Weimer wherein they state that they met and conferred on March 6, 2017 and that "[d]iscovery in this matter is ongoing and the parties have nearly completed all written discovery and have initiated discussions regarding scheduling for depositions. The parties agree that they are on schedule to meet the Court's discovery deadlines." (Docket No. 33). "One outstanding issue relates to the failure of one plaintiff to respond to written discovery. The parties have discussed this issue and Defendant anticipates that it will need to file a motion to compel." (Docket No. 34). There was no request for a status conference with the Court. The motion to

compel was not filed as Plaintiffs submitted Bailey's responses to written discovery on March 9, 2017. (Pl. Ex. X, Docket No. 59-24). In turn, Defense counsel Brittany Fink, Esq. submitted a second discovery deficiency letter to Plaintiffs' counsel on April 5, 2017. (Pl. Ex. X, Docket No. 59-24). With respect to interrogatory #2, she states that:

> Plaintiffs have yet to identify any documents or electronically stored information in the possession of any plaintiff. Plaintiffs have alleged multiple times that there have been statements made regarding retaliation for joining the *Stroman* lawsuit, but Defendants have yet to see any documents or electronically stored information that supports these allegations. If these allegations relate to verbal comments (i.e., if Plaintiffs do not possess any responsive material), please state as much. If not, please supplement accordingly. Pursuant to Rule 34(b)(2)(C) of the Federal Rules of Civil Procedure, please state whether Plaintiffs are withholding any responsive documents based on their objections.

(*Id*.). Defense counsel made a similar request as to request for production of document no. 10. (*Id.*).

Plaintiffs noticed and took the depositions of four McLachlan witnesses between April 11, 2017 and April 13, 2017. (Docket No. 59-15 at ¶ 44). The depositions included Dan Campbell; James McLachlan; Levi Hulliberger; Carolyn Vining; and a 30(b)(6) deposition. (Docket No. 59-15 at ¶ 44). Plaintiffs did not reveal the existence of the Bailey recordings prior to these depositions which included individuals whom Bailey had recorded without their knowledge.

The parties filed a joint motion to extend the discovery deadline on April 20, 2017 wherein they acknowledged the prior statement that they expected to be able to complete discovery by the April 28, 2017 deadline but noted that they were requesting a modest extension of the discovery deadline. (Docket No. 34). They stated that two items of written discovery remained outstanding which included Plaintiffs' supplemental responses to defendants' earlier discovery requests, which would be served by April 21, 2017. (*Id.*). They also requested that the plaintiffs' depositions be

rescheduled for June of 2017; noted that a Rule 30(b)(6) deposition was requested by plaintiffs; and that additional third party witnesses (Joel Lohrer, Jon Mito, and Greg Thornberry) may be deposed by the parties. (*Id*.). The Court granted this motion and extended discovery to June 9, 2017. (Docket No. 35).

On April 21, 2017, Plaintiffs served their supplemental responses and with respect to Request No. 10, Plaintiffs provided the following: "SUPPLEMENTAL RESPONSE: See previous responses, and any documents previously produced. Plaintiffs are not withholding any documents on the basis of any objection." Plaintiffs' counsel separately produced the Bailey audio recordings to Defendants on April 21, 2017 after counsel had conferred with the firm's ethics partner, and a Pennsylvania criminal defense lawyer and determined that the recordings had to be produced if Bailey was going to continue with the litigation. (Pl. Ex. O, Docket No. 59-15 at ¶ 46).

On May 4, 2017, Defense counsel filed a motion to continue the post-discovery status conference set for June 29, 2017 because its counsel would be unavailable at the time. (Docket No. 36). The Court granted the motion and rescheduled the matter for June 29, 2017. (Docket No. 37). A meet and confer phone call took place between counsel on May 9, 2017 at which time the Bailey audio recordings were discussed, Defendants expressed displeasure about the timing of the production and they also discussed an issue with respect to metadata of the recordings. (Docket No. 59-26 at 3-4). Next, Defendants filed a motion for extension of time to complete discovery for a limited purpose and a supporting brief on June 2, 2017. (Docket Nos. 38, 39). At that time, Defendants claimed that the Bailey recordings were illegally recorded and that the metadata indicated that the recordings were altered. The Court reached out to counsel and was advised that Plaintiffs had no objection to the requested continuance. Despite the agreement, the Court convened a status conference on June 7, 2017, (Docket No. 41), which was transcribed, (Docket

No. 43). The Court granted the motion extending the time for discovery to end on September 7, 2017, for the limited purpose of conducting the discovery described in said motion. (Docket No. 42). The Court also advised that the parties that it was available to referee any disputes that may arise during the upcoming depositions. (Docket No. 43 at 19).

The parties continued to hold the depositions of the named plaintiffs during the week of June 4, 2017. A dispute arose during Fuhs' deposition but the parties did not alert the Court as to same. Nearly a month after the June status conference, on July 12, 2017, defense counsel Niloy Ray[8] sent another letter to Plaintiffs' counsel, this time requesting additional information regarding: litigation hold notices and preservation processes; a list of cell-phones each plaintiff maintained from January 2015 to the present and demanding that they be produced for forensic examination; further demanding the production of any text messages, noting at times during their respective depositions when plaintiffs admitted that they texted with other individuals; and also demanding that Bailey's recorder be turned over for forensic examination. (Pl. Ex. Y; Docket No. 59-25). Plaintiffs responded in a letter dated July 26, 2017 providing information about their litigation hold, plaintiff's cell phones and the Bailey recordings and agreed to produce additional information by August 4, 2017. (Pl. Ex. Z, Docket No. 59-26). The Court was told via an email status report that discovery was not likely to be completed by the deadline of August 29, 2017. Hence, the Court entered an order requiring Plaintiffs to respond to all outstanding discovery requests by September 7, 2017. (Docket No. 47). The Court also ordered another status report to be filed by September 29, 2017, advising whether Defendants intended to move to compel any discovery or seek yet another extension for the parties to file a joint briefing schedule on a forthcoming motion for sanctions. (*Id.*).

---

[8]     On June 13, 2017, Niloy Ray, Esquire was granted leave to appear pro hac vice on behalf of Defendants, describing himself as eDiscovery Counsel in the Minnesota office of Littler Mendelson. (Docket No. 44).

Plaintiffs' counsel proceeded to collect ten cell phones from their clients and sent them for forensic imaging between August 2, 2017 and August 20, 2017. (Pl. Ex. O, Docket No. 59-15). The vendor advised that only seven of the ten phones could be imaged and collected 10,903 total messages from those seven devices.[9] (Pl. Ex. O, Docket No. 59-15 at ¶ 60). The vendor explained that the three devices which he could not image could be sent to a specialized lab to open them and "pull data directly from the silicon memory chips inside them," at a cost of approximately "$2,000 per device, without guarantee of success." (Pl. Ex. DD, Docket No. 59-30). Plaintiffs' counsel proceeded to conduct a manual review of all of the recovered messages between August 28, 2017 and September 6, 2017. (*Id.* at ¶ 62). On September 7, 2017, Plaintiffs produced to Defendants 406 individual messages (text messages and Facebook posts) obtained from Gardner and Roe's devices. (Pl. Ex. O, Docket No. 59-15 at ¶ 64). As far as the Court can tell, Plaintiffs have not sent the three described devices to any specialized lab to further attempt to extract data from them and Defendants have not demanded that they do so. It is also uncontested that the parties have not obtained call or text logs from service providers as to any of the cell phones which were lost, stolen or damaged. (Docket No. 70 at 118-119).

### D. *Plaintiffs' Devices*

The plaintiffs maintained a number of different devices throughout the activities of the *Stroman* case up to the present. A more detailed summary as to each of the Plaintiffs' devices and the status of same follows.

#### 1. Roe

In a declaration dated October 23, 2017, Roe states the following. (Pl. Ex. JJ, Docket No. 59-36). Roe used a Samsung Galaxy Note 3 from January 2015 through April 2016 and a Samsung

---

[9]     According to an affidavit of Angela Kittleson, litigation support specialist at Nichols Kaster, it cost $1,775 to forensically image 7 cell phones and $856.25 for forensic analysis of Bailey's recorder. (Pl. Ex. CC).

Galaxy S7 Edge thereafter until the present. (*Id*.). He kept both phones and they are still working. He initially conducted a manual search of the phones at the direction of his attorneys. (*Id*.). Although he sent texts and Facebook messages from the phones, he did not believe that he had any relevant messages about McLachlan or this lawsuit on the phone. (*Id*.). He sent the Note 3 to his counsel around April 2017 and the Galaxy SZ Edge to counsel in August of 2017. (*Id*.). Both were then forensically imaged. (*Id*.).

Plaintiffs' counsel states that 1,480 deleted messages were recovered from the Note 3 and only a few threads, containing 12 to 14 messages were deemed relevant and produced to Defendants. (*Id*.). The forensic examination of Roe's device led to the recovery of relevant text messages which discuss: (1) "McLachlan"; (2) "this whole law suite (sic)"; and (3) how happy he was at a new job. (*See* Docket No. 51).

### 2. Fuhs

Fuhs submitted a declaration dated October 20, 2017. (Pl. Ex. KK, Docket No. 59-37). Fuhs explains that he had a prepaid Verizon cell phone from 2015 until around June 2016 and then purchased a new Samsung Galaxy S4 thereafter which he currently maintains. (*Id*.). He explains that an attorney with Nichols Kaster requested that he look through his phone during 2015 and provide any text messages relevant to this lawsuit. (*Id*.). He took screen shots and forwarded them to counsel. (*Id*.). After purchasing the new phone, he kept the Verizon prepaid phone. He lost it for a time but relocated it. (*Id*.). The law firm also misplaced the screen shot text messages and he resent them a few months later. (*Id*.).

Fuhs states that he questioned his lawyer in June of 2017 as to whether he should bring the Verizon prepaid phone with him to Pittsburgh for his deposition. (*Id*.). They decided that he should not bring it to Pittsburgh so that he would not risk losing the cell phone. (*Id*.). When he

returned home, he could not find the Verizon cell phone but knew that his ex-wife had entered the home to retrieve some of her things while he was not there. (*Id*.). At present, he cannot find the phone and his ex-wife has denied knowing where the phone is or what happened to it. (*Id*.).

The Galaxy S4 was forensically imaged and 2,345 messages were extracted from it but counsel determined that those messages were <u>not</u> relevant and have not been produced. (*Id*.). Plaintiffs' counsel did, however, produce the two text messages which Fuhs felt were relevant on his initial review and of which he took the screen shots. (*Id*.).

### 3. Bailey

Bailey submitted a declaration dated October 20, 2017. (Pl. Ex. LL, Docket No. 59-38). With respect to the recordings, he admitted that during the fall of 2015, he used an Olympus recording device to make recordings of conversations he had related to the lawsuit and his employment at McLachlan. (*Id*.). He mailed the device to his lawyers in November 2015 and denies ever editing, altering or transferring the recordings onto another device prior to doing so. (*Id*.).

Bailey was provided company phones by McLachlan which he used for business and personal use at the time. (*Id*.). He initially had an iPhone and later was provided an Android phone. (*Id*.). Both were returned in due course to McLachlan. (*Id*.). On his last day of employment at McLachlan, in early October 2015, he asked that he be able to retain his phone so that he could transfer his personal pictures and contacts off of the phone to another phone and he was permitted to do so. (*Id.* at ¶ 5). He denies transferring, forwarding or deleting any text messages from the Android phone at that time. (*Id.*). The Android phone (and the iPhone) have

been in possession of Defendants throughout this litigation and no relevant text messages were produced to Plaintiffs from these phones.[10]  (*Id.*).

Bailey did not have a cell phone so Gardner provided him with a flip phone which he used until the Spring of 2016.  (*Id.* at ¶ 10).  He could not recall what happened to this device and testified as to same at his deposition.  (*Id.*).  But, he later found the flip phone in August of 2017 and provided it to his attorneys so that it could be forensically imagined.  (*Id.*).  He forwarded one text on the phone to his lawyers, a call back list which was sent to him by Kyle Reffitt.  (*Id.* at ¶ 11).  He does not recall deleting any messages from this phone.  (*Id.*).  This device was given to counsel, forensically imaged and no relevant text messages were recovered.  (Docket No. 60 at 17).

Bailey purchased a prepaid Boost Mobile phone in the Spring of 2016 which he used thereafter. (Pl. Ex. LL, Docket No. 59-38).  He admits that he did not immediately search that device for responsive text messages because he did not fully understand the need to preserve this information.  (*Id.*).  He lost the Boost Mobile phone when it was stolen out of a hotel room while he was travelling.  (*Id.*).  He only had the Boost Mobile device for a number of months.  Since this phone was lost, it was not forensically imaged and no text messages were produced from same. (*Id.*).

Bailey next used a Samsung Galaxy from May 2016 through April 2017.  (*Id.*).  He then switched to an old LG phone, which he used for a short period of time to lower his bill.  (*Id.*).  When he switched phones again, he gave the LG phone to his daughter.  (*Id.*).  He has been using an LG Fiesta cellular phone from June 2017 to the present.  (*Id.*).  All three of these devices (the

---

[10]     Defendants contend based on a declaration of their non-expert counsel Ms. Weimer (attached to the Reply Brief, no less) that the forensic examination proves that Bailey deleted information from these phones.  (Docket No. 63 at 3).

Samsung Galaxy; LG; and LG Fiesta) were sent to the attorneys for forensic imaging. (*Id.*). According to counsel, there were no relevant texts on the phones. (*Id.*).

### 4. LaFleur

LaFleur submitted a declaration dated October 20, 2017. (Pl. Ex. MM; Docket No. 59-39). LaFleur states that he possessed and used three different Huawei phones during the relevant time period and now uses an LG phone. (*Id.*). The first Huawei phone which he had from November 2014 through November 2015 was stolen from a bar. (*Id.* at ¶ 3). He then obtained a second Huawei phone which he used from November 2015 through October 2016. (Pl. Ex. MM; Docket No. 59-39). The screen on this phone cracked but he still had the phone and provided it to his attorneys to be forensically imaged. (*Id.*). He obtained a third Huwai phone in October 2016 which he used until June 2017 until he dropped it in a lake while boating. (*Id.*). LaFleur sent the second and third Huwaei phones to his counsel in August of 2017. (*Id.*). He now has an LG phone which he obtained in June 2017. (*Id.*).

LaFleur said that he never purposefully deleted any messages and never lost or destroyed a phone for that purpose. (*Id.*). He admits that he texted with Bailey, Fuhs, and possibly Gardner, to determine if McLachlan had any rigs up and running and if Bailey had heard anything about work. (*Id.*). He had a photo of the call back list which he sent to his attorneys. (*Id.*).

### 5. Gardner

Gardner submitted a declaration dated October 20, 2017. (Pl. Ex. NN, Docket No. 59-40). Gardner states that from 2015 until around October of 2015, he had a flip phone. (*Id.*). He explains that this is the phone that he gave to Bailey. (*Id.*). As noted above, Bailey located this phone, it was provided to counsel and no relevant text messages were located. (*Id.*). Gardner further notes that he rarely texted on the phone because it was difficult. (*Id.*). He denies deleting anything on

the phone. (*Id*.). Gardner next had a Samsung Galaxy S7 Edge from October 2015 through May 2017. (*Id*.). Gardner submits that, prior to joining this lawsuit, the phone had an automatic delete function which deleted his text messages. (*Id*.). He retained Nichols Kaster to represent him around February 25, 2016 and was advised by his attorneys in a letter dated April 6, 2016 to preserve relevant information, including text messages. (*Id*.). At that point, Gardner disabled the auto-delete function on the phone. (*Id*.). In May of 2017, Gardner broke the Galaxy while four wheeling with his family. (*Id*.). He still has possession of this phone. (*Id*.). Gardner replaced his broken phone with a Galaxy Note 4 in May of 2017. (*Id*.).

The Galaxy Edge was forensically imaged and 3,151 images were extracted, and 43 relevant text messages were produced including 6 conversations where Gardner was looking for work in May 2017. (*Id*.).

### E. *Relevant Procedural History*

During the June 7, 2017 telephone conference, Defendants alerted the Court and Plaintiffs that a motion for sanctions would be forthcoming and the Court granted Defendants leave to conduct limited discovery in support of such a motion. (Docket Nos. 41; 42). The Court thereafter ordered Plaintiffs to respond to all outstanding discovery requests by September 7, 2017 and extended the requested period of limited discovery to end on September 29, 2017. (Docket No. 47). The parties filed a joint status report on September 29, 2017, informing the Court that Defendants "did not intend to file a motion to compel additional discovery or additional information in this matter," (Docket No. 48), at which time the Court established a briefing schedule on a forthcoming motion for sanctions to be filed by Defendants. (Docket No. 49). Defendants filed their motion for sanctions, brief in support and supporting exhibits on October 11, 2017. (Docket Nos. 50, 51). On October 17, 2017, the parties filed competing motions

regarding the length of Defendants' brief, with Defendants seeking leave to file up to a 35-page brief and Plaintiffs seeking to strike the brief for failure to comply with this Court's Practices and Procedures. (Docket Nos. 52, 53, 54). The Court granted the motion for leave and then later granted a similar request for Plaintiffs to file a brief of up to 35-pages in length. (Docket No. 55). Plaintiffs filed their brief in opposition and supporting documents on October 23, 2017. (Docket Nos. 59, 60). Defendants filed their reply brief on November 1, 2017. (Docket No. 63). Plaintiffs submitted their sur-reply on November 13, 2017. (Docket No. 64).

After two continuances were granted, the Court held a motion hearing on February 15, 2018. (Docket Nos. 68; 70). Despite the relief sought by Defendants and the Court setting the matter as a hearing and oral argument, the parties declined to present any witness testimony. (Docket No. 70 at 3). At the conclusion of the hearing, the parties requested the opportunity to file supplemental briefs, which was granted by the Court. (Docket Nos. 68; 70). The transcript of the proceeding was filed with the Court on March 20, 2018. (Docket No. 70). Both parties filed supplemental briefs on May 1, 2018, at which point the matter was fully briefed and ripe for disposition. (Docket Nos. 71; 72). The Court purposefully retained the matter under advisement in an effort to get the parties to resolve their disputes. The Court issued its Order on September 28, 2018 granting, in part, and denying, in part, the defense motion for sanctions and now writes to further explain its rationale. (Docket No. 73).

III.    RELEVANT LEGAL STANDARDS

Whether to grant or deny a motion for discovery sanctions is generally committed to the sound discretion of the District Court. *See e.g., Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 577 (3d Cir. 2018) (citing *McLaughlin v. Phelan Hallinan & Schmieg, LLP*, 756 F.3d 240, 248 (3d Cir. 2014)). However, "due process considerations demand that a party and/or attorney to

whom a motion for sanctions is directed must have both notice and an opportunity to be heard." *Vay v. Huston*, Civ. A. No. 14-769, 2016 WL 1408116, at *9 (W.D. Pa. Apr. 11, 2016) (citing *Jones v. Pittsburgh Nat. Corp.*, 899 F.2d 1350, 1357 (3d Cir. 1990)). "The required notice must be 'explicit' and 'particularized,' advising the allegedly offending party of the precise legal theory under which sanctions are being advanced, (i.e., Rule 37, Rule 11, or 28 U.S.C. § 1927), and the form of relief that is requested as a sanction or sanctions, such as attorneys' fees, costs, exclusion of evidence or dismissal." *Id.* "[A] district court abuses its discretion in imposing sanctions when it 'bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 577 (3d Cir. 2018) (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 538 (3d Cir. 2007)) (further quotations omitted).

In similar vein, this Court's motions practice rules require that "motions must state with particularity the grounds upon which the motion is made and the relief or order that is sought" and "[t]he accompanying proposed order of court must detail the specific relief sought by the party." *Vay*, 2016 WL 1408116, at *8 (citations omitted). Further, "legal arguments not raised and relief that is not sought in the initial motion are generally deemed waived" and "[a]lthough this Court often holds oral argument and liberally permits supplemental briefing, these procedures should not be construed as the Court granting permission to raise for the first time new issues or arguments at the hearing and through supplemental submissions." *Id.* (citations omitted). As this Court noted previously,

> it would be an abuse of discretion for a District Court to award sanctions against a party or counsel in a form that was not part of the initial motion providing notice, without providing an opportunity to be heard on the precise type of sanctions that are awarded. *See McLaughlin*, 756 F.3d at 249-50 (quoting *Jones*, 899 F.2d at 1357) ("The 'mere existence' of a rule or statute concerning sanctions is insufficient to put a party on notice that sanctions are being contemplated."). When a party ups the ante by changing the

form of sanctions that it is seeking during ongoing proceedings, the proceedings become unnecessarily complicated and the Court must either: adjourn and provide the allegedly offending party a full and fair opportunity to respond; or, deny the relief for sanctions that is outside the scope of the initial notice.

*Vay*, 2016 WL 1408116, at *9.

IV.    DISCUSSION

Defendants seek sanctions for alleged: spoliation of ESI under Rule 37(e); deficient certifications under Rule 26(g)(3); and, coaching of a witness during a deposition under Local Civil Rule 83.3.[11]  (Docket Nos. 51; 63; 72).  Defendants' proposed order contains a laundry list of potential sanctions including dismissal of the entire case, with prejudice; an adverse inference that any lost information was favorable to the defense; attorneys' fees and costs; and, preclusion of evidence at the trial of this matter.  (Docket No. 50-1).  Plaintiffs contest the imposition of sanctions under all of these theories.  (Docket Nos. 60; 64; 71).  The Court now addresses each of the asserted bases for sanctions, in turn, starting with the alleged Rule 37(e) violation.

A.    *Alleged ESI Spoliation*

Defendants initially seek sanctions under Rule 37(e) which governs applications for sanctions arising from the spoliation of relevant ESI.  (Docket No. 50).  Defendants contend that the record supports a finding that ESI was lost in bad faith such that the severe sanctions of dismissal and/or an adverse inference should be ordered as to all of the Plaintiffs' claims.  (*Id*.).  Alternatively, Defendants maintain that they should be entitled to attorneys' fees and costs due to prejudice they allegedly sustained as a result of the lost ESI.  (*Id*.). Plaintiffs argue that the record

---

[11]    The Court notes that Defendants never filed a motion to compel in this case and therefore do not seek sanctions under Rule 37(c)(1) for violating any court orders.  *See* Civ. A. No. 16-376, Docket Report.  They also have not cited this Court's inherent authority or 28 U.S.C. § 1927 in support of sanctions.  (*See* Docket No. 51).  The Court declines to consider those potential sources of sanctions sua sponte because, consistent with *Vay*, 2016 WL 1408116, at *9, notice has not been provided to Plaintiffs that sanctions were being sought under such authority.

does not support findings that they acted in bad faith with intent to deprive Defendants of relevant ESI and that each of their claims and respective handling of ESI must be reviewed individually rather than as a group. (Docket Nos. 60; 64; 71). They continue that they took reasonable steps to preserve ESI and that any lost information is also attributable, in part, to the fact that Defendants did not timely request that they forensically image their cell phones. (Docket Nos. 60; 64; 71). Having carefully considered the parties' positions on these issues, the Court finds that Defendants have failed to meet their burden to demonstrate that any of the Plaintiffs acted with intent to deprive Defendants of any relevant ESI and that they were prejudiced by the loss of any such information.

### 1. Relevant Law

As the moving party, the burden is on Defendants "to show that spoliation occurred and what sanctions are appropriate." *Goldrich v. City of Jersey City, et al.*, 2018 WL 4492931, at *7 (D. N.J. Jul. 25, 2018), *report and recommendation adopted as modified by*, 2018 WL 4489674 (D. N.J. Sept. 19, 2018). Rule 37(e) provides that:

> (e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > >
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C) dismiss the action or enter a default judgment.

Fᴇᴅ. R. Cɪᴠ. P. 37(e).  To demonstrate spoliation, "defendants must show: (1) certain ESI should have been preserved in anticipation or conduct of litigation; (2) that evidence was lost; (3) the ESI was lost because plaintiff failed to take reasonable steps to preserve it; and (4) that it cannot be restored or replaced." *Goldrich*, 2018 WL 4492931, at *7.

If these elements are established, "to determine the appropriate sanctions to be imposed, the Court must find either prejudice to defendants or that plaintiff acted with the intent to deprive defendants of the ESI's use in the litigation." *Id.*

> "To make a determination of bad faith, the court must find that the spoliating party 'intended to impair the ability of the potential defendant to defend itself.'" *Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 315 (D. Del. Jan. 2, 2013) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir. 1994)); *see also St. Clair Intellectual Prop. Consultants, Inc. v. Toshiba Corp.*, 2014 WL 4253259, at *5 (D. Del. Aug. 27, 2014) (finding no bad faith where conduct consists of "inadvertence, negligence, inexplicable foolishness, or part of the normal activities of business or daily living").
>
> The related "question of prejudice turns largely on whether a spoliating party destroyed evidence in bad faith." *Micron*, 917 F. Supp. 2d at 319 (internal quotation marks omitted). A finding of prejudice requires a party to "come forward with plausible, concrete suggestions as to what the lost evidence might have been" and a showing that its loss "materially affect[ed] the substantial rights of the adverse party and is prejudicial to the presentation of the case." *Magnetar*, 886 F. Supp. 2d at 481 (internal quotation marks omitted).

*GN Netcom, Inc. v. Plantronics, Inc.*, Civ. A. No. 12-1318-LPS, 2016 WL 3792833, at *5–6 (D. Del. July 12, 2016).  When determining the appropriate sanction, the Court considers: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and ... deter such conduct by others in the future." *Capogrosso v. 30 River Court E. Urban Renewal Co.*, 482 F. App'x 677, 682 (3d Cir. 2012).  "The 2015 Advisory

Committee Notes to amended Rule 37(e) explain that '[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation,' and a court is 'not require[d] ... to adopt any of the measures listed in subdivision (e)(2)' if 'lesser measures such as those specified in subdivision (e)(1) would be sufficient to redress the loss.'" *GN Netcom, Inc.*, 2016 WL 3792833, at *5 (quoting 2015 Advisory Comm. Notes to Rule 37(e)). The Court is tasked with determining the weight to be given to the evidence presented by the parties and evaluating the credibility of same. *See e.g., DVComm, LLC v. Hotwire Comm., LLC*, 2016 WL 6246824, at *1 (E.D. Pa. Feb. 3, 2016).

2. <u>Discussion</u>

Defendants present this motion as an "all or nothing" proposition by seeking dismissal or an adverse inference as to the entire group of five Plaintiffs without differentiating between them as to the relief sought. (Docket No. 51). Plaintiffs maintain that the motion for sanctions must be evaluated as to each of them individually, particularly as the most significant sanctions under § 37(e)(2) require a finding that a party acted with the subjective intent to deprive his opponent of relevant ESI. (Docket No. 60). The Court agrees with Plaintiffs on this contested issue and will evaluate the evidence as to each Plaintiff, individually, in the next few sections of this Opinion. With that said, the Court finds that the record, as a whole, does not support a conclusion that any of the Plaintiffs acted in bad faith with the intent to deprive Defendants of relevant ESI or that Defendants sustained sufficient prejudice due to the loss of ESI to justify the imposition of sanctions under Rule 37(e). The Court reaches these decisions for several reasons.

First, while the record is uncontested that several cell phones utilized by the Plaintiffs between 2015 and 2017 were lost, stolen, or damaged and that some ESI was not preserved on others that they maintained, all of the Plaintiffs have denied intentionally deleting any ESI and

Defendants have simply not proven that the Court should discredit their sworn denials. At most, Defendants have demonstrated that Plaintiffs were negligent in mishandling their devices but the same does not suffice to justify sanctions under Rule 37(e)(1). *See Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) ("It bears adding that to the extent Applebaum sought an adverse inference instruction for spoliation of electronic information, a 2015 amendment to Civil Rule 37(e)(2) required her to show that Target had 'intent' to deprive her of the information's use. A showing of negligence or even gross negligence will not do the trick."); *Abdelgawad v. Mangieri*, Civ. A. No. 14-1641, 2017 WL 6557483, at *3 (W.D. Pa. Dec. 22, 2017) ("Because Mangieri did not act with the intent to deprive Plaintiff of access to the lost electronic materials, the Court may not presume that the lost information is unfavorable to Mangieri.").

Second, the Court provided Defendants with ample opportunities to gather sufficient evidence to build their case to justify the imposition of sanctions but they declined all of the following: (1) to move to reopen the Plaintiffs' depositions to further question them about their handling of the devices and ESI, including the tardily produced ESI as to Roe and Gardner; (2) to subpoena Plaintiffs' cell phone carriers to obtain call or text logs which would have shown, at a minimum, whether communications took place during the relevant time frame; or (3) to call any of the Plaintiffs as witnesses at the motion hearing to challenge their declarations. Without such evidence, Defendants largely rely upon excerpts of the Plaintiffs' deposition testimony and the ESI they produced and from which they ask the Court to draw speculative inferences about the Plaintiffs' subjective intent. *See e.g., Goldrich v. City of Jersey City*, 2018 WL 4492931, at *11 (D.N.J. Jul. 25, 2018) ("[T]he Court declines to speculate that plaintiff intentionally deprived defendants of the evidence."). But, this Court is not inclined to make such adverse findings regarding their subjective intent without being able to observe their demeanor and evaluate their

credibility while on the witness stand. *Id.* ("the Court finds circumstantial evidence alone to be an insufficient basis on which to find that plaintiff acted with the intent to spoliate relevant evidence."). Hence, the present motion is distinct from several cases where sanctions have been imposed upon which Defendants rely but where the presiding courts were able to assess the credibility of the alleged spoliators. *See e.g., DVComm, LLC v. Hotwire Comm., LLC, et al.*, Civ. A. No. 14-5543, 2016 WL 6246824, at *1 (E.D. Pa. Feb. 3, 2016) (imposing sanctions after evaluating credibility of alleged spoliators); *GN Netcom, Inc. v. Plantronics, Inc.*, 2016 WL 3792833, at *1 (D. Del. Jul. 12, 2016) (same).

Third, although Plaintiffs did not preserve all of their data on certain of their devices, Defendants have not met their burden to demonstrate that they were prejudiced by the loss of any relevant ESI from such devices. To this end, they have not provided concrete, plausible suggestions as to any <u>relevant</u> ESI that was lost and thereby materially affected their substantial rights, preventing them from defending this case. *Magnatar*, 886 F. Supp. 2d at 481. Instead, they have offered conjecture as to what they believe may have been on the devices but that is not enough to justify the imposition of sanctions. *See e.g., ML Healthcare Servs., LLC v. Publix Super Markets, Inc.*, No. 15-13851, 2018 WL 747392, at *10 (11th Cir. Feb. 7, 2018) (upholding denial of adverse inference as there was no evidence of bad faith by Publix producing surveillance video depicting plaintiff's injury and not preserving video from 35 days prior to the injury because "[f]ailure to preserve such speculative evidence does not raise the specter of bad faith in the same way that a failure to preserve evidence of a specific, crucial event in a case might" and affirming denial of alternative sanctions request to exclude such evidence as it was "purely speculation and conjecture."); *Flanders v. Dzugan*, Civ. A. No. 12-1481, 2015 WL 5022734, at *5 (W.D. Pa. Aug. 24, 2015) ("The only thing Plaintiff can say with any specificity is that Defendants do not appear

to have put a litigation hold in place. Plaintiff cannot show any evidence was actually lost or destroyed. Plaintiff also cannot show that if evidence was lost or destroyed, it would have been beneficial to his case."). At the same time, the seven devices which were forensically examined contained 10,903 total messages, with 406 messages deemed relevant such that they were then produced to Defendants, or only 3 percent. [12] (Pl. Ex. O, Docket No. 59-15 at ¶ 60).

This case is therefore distinguishable from the recent decision by the Honorable Kim R. Gibson in *Sinclair v. Cambria County*, 2018 WL 4689111, at *2-4 (W.D. Pa. Sept. 28, 2018). In *Sinclair*, the plaintiff brought a failure to promote claim against her employer and testified that she had texted several coworkers in preparation for her deposition asking them each about her job performance; a document request seeking the text messages was promptly served 10 days after the deposition; plaintiff responded three months later than she did not retain all of the messages; and defendants obtained her cell phone records which showed that at least 78 unrecovered messages were sent to the specific coworkers she named in the deposition. *Id.* Judge Gibson found that bad faith was not shown in the record but held that Defendants were prejudiced by the loss of such relevant ESI, assessing attorneys' fees and costs for pursuing such discovery. *Id.* In contrast, Defendants have simply not built a sufficient record here for the Court to make a finding that they were prejudiced by the loss of devices.

Fourth, as the Court pointed out at the motion hearing, Defendants seek significant sanctions including dismissal, an adverse inference and the preclusion of evidence but did not adhere to Third Circuit precedent which requires an evaluation of a number of factors including the merits of the underlying claims prior to issuing those types of sanctions. (Docket No. 70 at

---

[12]     As noted, Defendants have also not demanded that the three cell phones which could not be forensically examined initially be sent to a specialized lab for further attempts at same at a cost of $2,000 per device. (*See* Pl. Ex. DD, Docket No. 59-30).

113).  Following *Vay*, Defendants' supplemental brief analyzing the *Poulis* factors for the first time can be disregarded and such relief can be denied on this basis alone.  *See Vay*, 2016 WL 1408116, at *8. However, in their supplemental brief, Defendants admit that Plaintiffs have presented meritorious claims and that such factor is neutral, significantly undermining their requests for the imposition of such harsh sanctions.  (Docket No. 72 at 21 (conceding that "Plaintiffs have pleaded a claim that, "if established at trial, would support recovery").  From the Court's perspective, the evidence of retaliation in this record is strong given both the timing of the layoffs vis-à-vis Plaintiffs' decisions to participate in the *Stroman* lawsuit and the negative, even profane comments about Plaintiffs attributed to Defendants' supervisors and management level employees who allegedly called them "niggers," "greedy fuckers," "worthless," "piece[s] of shit" and the like who were "stealing" the company's money.  (Pl. Ex. A, Docket No. 59-1; Pl. Ex. G, Docket No. 59-7).  Further, these comments are supported by a third party witness and the text messages produced by Defendants, among other evidence.  (Pl. Ex. A, Docket No. 59-1; Pl. Ex. L, Docket No. 59-12).

Aside from these general conclusions, the Court holds that the specific factual scenarios involving each individual Plaintiff do not support the imposition of sanctions under Rule 37(e).

### a.  Roe

As to Roe, Defendants have failed to meet their threshold burden to demonstrate that relevant ESI was lost such that the request for sanctions must be denied.  *See e.g., Air Products and Chemicals, Inc. v. Wieseman*, 2017 WL 758417, at *1 (D. Del. Feb. 27, 2017) (denying sanctions because "defendants have not met the threshold requirement under Fed. R. Civ. P. 37(e) of showing that ESI was actually lost.").  Indeed, Roe retained both of his phones, they were forensically examined and relevant text messages and Facebook postings, (including a few which

were previously deleted on the phone), were produced to Defendants, albeit in September of 2017. (Pl. Ex. JJ, Docket No. 59-36). While some of those messages were previously deleted and recovered during the forensic examination, as the commentary to Rule 37(e) notes, spoliation occurs "only when such information is lost. Because electronically stored information often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere." FED. R. CIV. P. 37(e), 2015 amd. Thus, as there has been no showing that ESI was lost from Roe's devices, he cannot be subject to sanctions under Rule 37(e), including dismissal or an adverse inference.[13]

### b. Fuhs

With respect to Fuhs, Defendants have established that ESI was lost as he admits that he lost a prepaid Verizon phone he used between 2015 and June of 2016 at a time when he was in Pittsburgh for his deposition in June of 2017. (Docket Nos. 51; 60). However, Defendants have not adduced sufficient evidence to establish that Fuhs acted in bad faith, with intent to deprive Defendants of relevant ESI, or that they sustained prejudice as a result of the lost cell phone. Therefore, the Court finds that the imposition of sanctions is not appropriate as to Fuhs under either Rule 37(e)(1) or 37(e)(2).

Defendants suggest that Fuhs' loss of the prepaid Verizon phone is a "dog ate your homework" type excuse that should not pass muster and should be rejected by the Court in favor of a finding of bad faith, inferred from the circumstances of claimed lost evidence while he was in Pittsburgh for his deposition. (Docket Nos. 51; 63; 72). Defendants also suggest that they have

---

[13] It is also speculative for the Court to infer from Roe's handling of his messages, i.e., by deleting some relevant messages which were recovered by a forensic examination that the other Plaintiffs handled their own phones in a similar manner. Roe worked near Mansfield, Pennsylvania and did not even work with the other four Plaintiffs. (Docket No. 1 at ¶¶ 21-23). In addition, the recovery of all of Roe's cell phone data actually demonstrates that there were no relevant communications between him and the other plaintiffs which were not produced to Defendants.

been prejudiced because Fuhs' allegations in his complaint "wholly" rely upon evidence which could be proven or disproven by information on the phone. (*Id*.). Plaintiffs counter that prior to losing the phone, Fuhs manually reviewed it, and relevant text messages have been produced to Defendants from this review. (Docket Nos. 60; 64; 71). They continue that Fuhs also maintained a second phone which has been forensically imaged, with 2,345 messages extracted but none have been produced as counsel determined they were not relevant and Defendants have not moved to compel nor challenge that decision. (*Id*.).

After reviewing the record, the Court rules that there is insufficient evidence for a finding that Fuhs acted in bad faith with the intent to deprive Defendants of any relevant ESI which may have been on his prepaid Verizon phone. While the circumstances of how the phone was lost are curious, Fuhs provided sworn testimony during the deposition that he left the phone at his residence. (*See* Pl. Ex. KK, Docket No. 59-37). The record is undisputed that he did so upon the advice of counsel and <u>no</u> evidence has been presented to undercut his sworn statement that he could not locate the phone upon his return. (*Id*.). Defendants also declined to call Fuhs as a witness at the motion hearing such that the Court was not provided the opportunity to evaluate his credibility on the witness stand. At most, this record indicates that Fuhs acted negligently by leaving the phone in a residence at times when his ex-wife would be removing items from the home. But, the same simply does not support a finding that Fuhs acted in bad faith, with intent to deprive Defendants of relevant ESI. *See Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) ("It bears adding that to the extent Applebaum sought an adverse inference instruction for spoliation of electronic information, a 2015 amendment to Civil Rule 37(e)(2) required her to show that Target had 'intent' to deprive her of the information's use. A showing of negligence or even gross negligence will not do the trick.").

Defendants have likewise failed to show that they have been prejudiced by the loss of Fuhs' prepaid Verizon phone. A finding of prejudice requires a party to "come forward with plausible, concrete suggestions as to what the lost evidence might have been" and a showing that its loss "materially affect[ed] the substantial rights of the adverse party and is prejudicial to the presentation of the case." *Magnetar*, 886 F. Supp. 2d at 481. Defendants have not met this burden as they have merely provided unwarranted and speculative inferences from the current record in an effort to show that they have been prejudiced by the loss of this phone. (*See* Docket Nos. 51; 63; 72). Again, Fuhs manually reviewed the phone and provided two relevant text threads to his counsel, both of which were produced to Defendants. (Pl. Ex. U, Docket No. 59-21).[14] Fuhs also preserved another phone from a later time period and after a forensic review of same, no relevant texts were found or produced. (Pl. Ex. KK, Docket No. 59-37). In addition, one of the threads that was produced was a text conversation with Campbell that was not located by Defendants when they forensically reviewed Campbell's phone. (*See* Docket No. 70 at 44). While Fuhs admitted that he deleted a voicemail from Campbell, he testified under oath as to the circumstances and can be cross-examined at trial on the lack of retention of the voicemail. Otherwise, Defendants' hypothesis that there must be relevant ESI on the phone given the allegations set forth in Plaintiffs' Complaint is too speculative for the Court to impose sanctions under Rule 37(e). Again, what is required are plausible, concrete, suggestions of the content of any lost ESI. *See Magnetar*, 886 F.

---

[14]   The Blankenship text thread is dated September 30, 2015 wherein he tells Fuhs "U all are coming back. They just told baker to pack it up tomorrow" and then on October 2, 2015 asks him "What happened pal? U find another job." (Pl. Ex. U). On the second text, Fuhs' responds "Nope I signed the lawsuit they owed me 34k in overtime wages along with everyone in the company so people get to work while others get laid off who working out there." (*Id.*). Blankenship responds "Oh ok I see lol don't blame u." (*Id.*).

   In the second set of texts with Dan Campbell, Fuhs states on October 22, 2015 "Hey Dan I was wondering if you knew if I was working days (sic) nights and who I would be working with and the address thank you." (*Id.*). Campbell responds "I will call u tomorrow I'm busy tonight." (*Id.*). The next day, Campbell writes, "Call me" and then adds "Plains (sic) have change (sic) JKLM shut down for 30 days so we are going to use them guys. Call me." (*Id.*).

Supp. 2d at 481. Therefore, Defendants have not demonstrated that they were prejudiced by the loss of this phone.

### c. LaFleur

As to LaFleur, ESI was lost because the first Huwai cell phone that he used from November 2014 to November 2015 was stolen off a countertop at a bar and the third Huawei cell phone which he used from October 2016 through June 2017 was damaged after he dropped it into a lake while boarding a pontoon boat. (Pl. Ex. MM, Docket No. 59-39). At most, the loss of these devices is attributable to his negligence and/or a criminal act by a third party. Accordingly, there is no basis for sanctions under Rule 37(e)(2) as to the loss of these phones.

The Court further finds that Defendants have not established that sanctions should be awarded under Rule 37(e)(1) as their proffered evidence of prejudice is speculative, at best. *See Magnetar*, 886 F. Supp. 2d at 481. LaFleur admits that he texted with Bailey, Fuhs, and possibly Gardner, to determine if McLachlan had any rigs up and running and if Bailey had heard anything about work. (Pl. Ex. MM, Docket No. 59-39). However, there were no relevant texts on LaFleur's second Huawei cell phone which he used from November 2015 through October 2016. (*Id.*). Once again, it would be speculative to infer that relevant text messages exist on his other two phones which are not smart phones. Defendants have simply not "come forward with plausible, concrete suggestions as to what the lost evidence might have been" nor that they have been materially adversely affected by the loss of such evidence. *Magnetar*, 886 F. Supp. 2d at 481.

### d. Bailey

With respect to Bailey, ESI was lost because none was recovered from a company-issued Android device he returned in October, 2015 and a Boost Mobile Phone that he used during a few months in the spring of 2016 was stolen from a hotel room. (Pl. Ex. LL, Docket No. 59-38).

However, the record does not establish that it was Bailey that deleted anything off of the Android phone because it was forensically examined approximately one year after it was returned to the company.[15]  Again, Bailey denied deleting anything and he was not called as a witness at the hearing such that the Court cannot evaluate his credibility.  (Pl. Ex. LL, Docket No. 59-38).  Defendants have also failed to establish that they were prejudiced by the loss of such ESI, again relying on speculation as to what may have been on those devices.  *See* Fed. R. Civ. P. 37(e)(2).  The remainder of Bailey's devices (including the digital recorder) were preserved such that no ESI was lost from those devices.  (Pl. Ex. LL, Docket No. 59-38).  All told, this record does not support Rule 37(e) sanctions as to Bailey.

e.  Gardner

Finally, some ESI was lost by Gardner because he had an auto-delete function enabled on his Samsung Galaxy Edge smart phone from October 2015 through April 2016.  (Pl. Ex. NN, Docket No. 59-40).  The record is uncontested that Gardner transitioned from a flip phone to a smart phone and did not understand the auto-delete function until he was told to disable it by his lawyers in April of 2016.  (*Id*.).  From that point in time, he maintained the phone and preserved the data until it was imaged in the summer of 2017.  (*Id*.).  The commentary to the 2015 amendments to Rule 37 addresses this type of situation:

> As under the current rule, the routine, good-faith operation of an electronic information system would be a relevant factor for the court to consider in evaluating whether a party failed to take

---

[15]  The sole evidence cited for the proposition that Bailey deleted ESI from the phone is an affidavit from defense counsel Jill Weimer, Esq. dated November 1, 2017 wherein she states that "2. Plaintiff Jeffery Bailey returned his McLachlan issued cell-phone phone on or about October 1, 2015 and it contained zero text messages, voice-mail or phone-call logs dating to the months that he used the device. 3. A forensic examination revealed that the only text-messages the device held were incoming texts from October 20, 2015 forward, i.e., after he had returned the device." (Docket No. 63-7 at ¶¶ 2-3).  This declaration was not provided with the initial motions practice but is attached to the Reply Brief; hence, it may be disregarded by the Court.  *See* n.10, *supra*.  Moreover, Ms. Weimer's affidavit –which fails to acknowledge that the forensic examination took place a year later during the discovery period in this case and was in Defendants' possession the whole time – does not credibly prove that it was Bailey that deleted anything off of the phone.  *See DVComm*, LLC, 2016 WL 6246824, at *1.

reasonable steps to preserve lost information, although the prospect of litigation may call for reasonable steps to preserve information by intervening in that routine operation. This rule recognizes that "reasonable steps" to preserve suffice; it does not call for perfection. The court should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation.

Fed. R. Civ. P. 37(e), 2015 amd. Given his lack of sophistication, the Court concludes that Gardner took reasonable steps to preserve data in this case and there is no evidence supporting a finding that he intentionally destroyed ESI. In any event, the defense has not proven as to this Plaintiff that any ESI which was lost during that time period was relevant to the case nor that they were prejudiced by the lack of such information.

3. Conclusion

For all of these reasons, Defendants' motion for sanctions under Rule 37(e) is denied because they have failed to demonstrate bad faith or intentional destruction of evidence or that they were prejudiced by the loss of underlined relevant ESI. *GN Netcom, Inc.*, 2016 WL 3792833, at *5-6. The record developed here is simply not supportive of such severe sanctions including dismissal of the entire lawsuit or an adverse inference and the defense's pursuit of this type of relief appears to be an overzealous attempt to avoid a jury hearing this strong retaliation case. With that said, the Court recognizes that Plaintiffs and their counsel were sloppy in their data preservation. Plaintiffs' counsel was also "penny wise and pound foolish" in deciding not to obtain and forensically image their client's cell phones in the first instance as the upfront investment of a few thousand dollars would have saved them from the much more expensive costs of litigating all of these disputes. Additionally, sanctions are inappropriate here because even Defendants admit that forensic imaging of custodians' cell phones is not a requirement under the law but a "best practice"

to be undertaken on a case-by-case basis. (*See* Docket No. 72-15 at ¶ 7 ("Defendants believe forensic imaging to be the best practice for collecting cell-phone contents when a party's discovery obligations require discovery from a cell-phone, i.e., the decision to forensically image a phone is case-dependent.")).

Overall, it is quite apparent that nearly all of these disputes could have been avoided had the attorneys – all of whom are from sophisticated law firms with ESI practices – done a better job communicating about the ESI plan as directed to Plaintiffs at a much earlier point in the case. To reiterate, the Court was told in advance of and during the case management conference that e-discovery specialists from both sides were involved and that there were no issues with the parties' ESI protocol or data preservation. (Docket No. 17). The Court was also informed that there were no objections to initial disclosures even though Plaintiffs' initial disclosures very clearly make no mention of ESI. (*See* Docket Nos. 17; 71-1). If the Court had been contacted at an earlier time, via a request for a discovery status conference, the filing of a motion to compel or otherwise, the Court would have intervened and resolved any disputes promptly and in a much more cost effective manner for all involved.[16] *See Abdelgawad*, 2017 WL 6557584, at *4 (rejecting the plaintiff's request for an adverse inference when the plaintiff could have filed a motion to compel the documents but did not do so, among other things). Alternatively, the Court could have referred these issues to an E-Discovery Special Master. *See* U.S. District Court, Western District of Pennsylvania, *E-Discovery Special Masters*, *available at:* http://www.pawd.uscourts.gov/ed-special-masters (last visited 10/26/18).

   B. *Rule 26(g)(3)*

---

[16]    The Court further notes that it has no reason to act when parties appear at case management conferences and advise that there are no issues with Rule 26(a)(1) disclosures or ESI protocols as they did here and file status reports six weeks prior to the close of discovery advising that "they are on schedule to meet the Court's discovery deadlines." (Docket No. 33).

Defendants next pursue sanctions in the form of attorneys' fees and costs under Rule 26(g)(3) complaining that the certifications by Plaintiffs' counsel on initial disclosures, interrogatories, requests for production and a joint supplement as to same were "boilerplate," "vague," and failed to notify them about the existence of ESI in the form of the Bailey recordings or the information which was later produced from the cell phones of Fuhs, Gardner and Roe. (Docket No. 51). They point to certain productions made by Plaintiffs after the written discovery was propounded, including that:

- on April 21, 2017, Plaintiffs produced the Bailey recordings;

- on June 5, 2017, Plaintiffs produced two text message exchanges from Fuhs; and,

- on September 7, 2017, Plaintiffs produced 406 text-messages and social media communications from Roe and Gardner.

(*Id*. at 21). Plaintiffs contest that they committed a violation of Rule 26(g)(3) and otherwise maintain that they have presented substantial justification for withholding certain evidence and that any such errors were harmless. (Docket No. 60). After reviewing the parties' arguments in light of the evidence of record, Defendants' motion is granted to the extent that they have proven that sanctions should be imposed for the Rule 26(g)(3) violation as to Bailey but such motion is denied in all other respects.

1. Relevant Law

The Court turns to the relevant legal standards. Rule 26(g) provides, in pertinent part, that:

(g) Signing Disclosures and Discovery Requests, Responses, and Objections.
(1) Signature Required; Effect of Signature. Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name--or by the party personally, if unrepresented-- and must state the signer's address, e-mail address, and telephone number. By signing, an attorney or party certifies that to the best of

the person's knowledge, information, and belief formed after a reasonable inquiry:

> …

> (B) with respect to a discovery request, response, or objection, it is:

>> (i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

>> (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

>> (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

>> …

> (3) Sanction for Improper Certification. If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

Fed. R. Civ. P. 26(g). "The non-producing party shoulders the burden of proving substantial justification for its conduct or that the failure to produce was harmless." *Tolerico v. Home Depot*, 205 F.R.D. 169, 175 (M.D. Pa. 2002). "While the Third Circuit has not directly addressed this 'substantial justification' standard, *see Grider v. Keystone Health Plan Central, Inc.*, 580 F.3d 119, 140 n. 23 (3d Cir. 2009), district courts in this circuit have defined 'substantial justification' as 'justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with this disclosure request.'" *Ely v. Cabot Oil & Gas Corp.*, Civ. No. 3:09-CV-2284, 2016 WL 4169197, at *2 (M.D. Pa. Feb. 17, 2016) (quoting *Tolerico*, 205 F.R.D. at 175). Aside from attorney's fees, an appropriate sanction in such circumstances may include reopening a deposition in order to fully question the deponent

39

regarding the untimely disclosed materials.[17]  *See e.g., Newill v. Campbell Trans. Co., Inc.*, 2013 WL 6002349, at \*7 (W.D. Pa. Nov. 12, 2013) (holding that reopening deposition and imposing costs on party which failed to conduct a reasonable investigation into existence of relevant documents was appropriate sanction).

## 2. Discussion

At the outset, the Court finds that Defendants' motion practice tactics violate several key tenets of this Court's decision in *Vay* as their arguments for sanctions are not sufficiently specific and they also improperly expanded the record and the scope of sanctions sought throughout these proceedings.  (*See* Docket Nos. 51; 63; 70; 73).  To this end, it is expected that a party seeking sanctions for alleged improper certifications by counsel and/or a party under Rule 26(g)(3) will provide the Court with the challenged discovery materials for which sanctions are sought and to quote and analyze the specific language of the questions and responses in their briefing.  *See* Fed. R. Civ. P. 26(g)(3) ("By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry").  Defendants did not do so here as their initial motion and brief attached Fuhs' Responses to Defendants' First Set of Interrogatories dated November 15, 2016, (Def. Ex. O, Docket No. 51-15); excerpts of Jeffrey Bailey's March 9, 2017 Response to Defendants' First Set of Interrogatories and Responses to

---

[17]    The Court notes that parties remain under an ongoing duty to supplement their responses.  Rule 26(e) provides:

> (e) Supplementing Disclosures and Responses.
> (1) In General. A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission-- must supplement or correct its disclosure or response:
> (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>
> (B) as ordered by the court.

Fed. R. Civ. P. 26(e).

Defendants' First Set of Document Requests, (Def. Ex. P., Docket No. 51-16); and Plaintiffs' Joint Supplemental Responses to Defendants' First Set of Document Requests, (Def. Ex. R, Docket No. 51-18), but did not include any of the other Plaintiffs' responses to such written discovery or their initial disclosures, which were supplemented in subsequent filings. Defendants also used their 35-page brief to cobble together excerpts of the limited discovery responses provided to the Court in a manner which made for interesting prose but was largely unhelpful to the Court's resolution of such a serious matter. (*See* Docket No. 51 at 19-21; 31-33). As our Court of Appeals has held, "courts rely on the litigants not only to cite relevant precedents, but also to frame the issues for decision," *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010), and "'[j]udges are not like pigs, hunting for truffles buried in' the record." *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (quoting *United States v. Dunkel*, 927 F.2d 955, 756 (7th Cir. 1991)). Stated another way, when parties seek discovery sanctions against their opponents, it is not the Court's burden to scour a disjointed and incomplete record in an effort to assist the movant in obtaining such sanctions. Quite naturally, that burden lies with the movant.

Applied here, Defendants' motion is defective to the extent that it seeks sanctions against Roe, Gardner or LaFleur because the record was not perfected to include the necessary responses to the challenged discovery until the reply brief was submitted and the initial disclosures were provided even later as part of the supplemental briefs.[18] (*See* Docket Nos. 50; 51). On the other hand, the Court will consider the defense's Rule 26(g)(3) challenges as to Bailey and Fuhs, in turn.

---

[18]    The Court notes that no ESI was produced by LaFleur during the extended discovery period such that his discovery responses all remain technically accurate. (*See* Docket No. 51 at 5, n.1). The same is true for Gardner, as Defendants admit that all of the ESI produced during the extended discovery period post-dates the April 21, 2017 Supplemental Responses to discovery. (*Id.* ("the only messages pre-dating April 2017 are from Mr. Roe's phones.")). Hence, the Court would find that neither violated Rule 26(g)(3). As for Roe, Defendants have offered no justification for failing to provide the Court with the challenged discovery responses to interrogatories and document requests along with the initial motion and brief. (*See* Docket Nos. 63; 72). They also expressly declined to move to reopen his deposition to question him about the untimely production of text messages and social media communications such that they are apparently satisfied with the credibility issues inherent in the conflicts between his deposition testimony

a. <u>Bailey</u>

Defendants argue that Bailey's responses to Interrogatories and Requests for Production served on March 6, 2017 violate Rule 26(g)(3) because they make no reference to the law firm's possession of the recordings that Bailey made of conversations with McLaughlin representatives in September and October of 2015 and instead lodge boilerplate objections to the requests. (Docket No. 51). They continue that they were significantly prejudiced by the late production as Plaintiffs noticed and took the depositions of the defendants' witnesses who were recorded by Bailey prior to those recordings being produced. (*Id.*). Plaintiffs counter that they had substantial justification for withholding the recordings in that counsel had to conduct extensive research on a "thorny" ethical issue concerning whether Bailey illegally made the recordings and could assert a Fifth Amendment privilege to production. (Docket No. 60). They further contend that any violation of Rule 26(g)(3) is harmless because the recordings were produced on April 21, 2017, the same day as the supplemental responses to the written discovery, and well in advance of Bailey's deposition in June of 2017. (*Id.*). Consistent with this Court's Order, Defendants' position is well-taken and sanctions will be imposed for Bailey's (and counsel's) violation of Rule 26(g)(3).

The challenged discovery requests and responses as to Bailey are the following:

> INTERROGATORY NO. 2: Identify (by description and location) all documents electronically stored information, and tangible things in your possession, custody or control that pertain to any of the allegations contained in your Complaint.
>
> RESPONSE: Plaintiff objects to the Interrogatory on the grounds that it is overbroad, ambiguous, vague, and unduly burdensome. Subject to and without waiving any objections, see Plaintiffs' document productions. Discovery is continuing.
>
> …

---

and the text messages and social media communications. (*See* Docket No. 48 ("Defendants do not intend to file a motion to compel additional discovery or information in this matter.")). Therefore, absent the procedural defect, the Court would exercise its discretion and decline to order sanctions with respect to Roe. *See Clientron Corp.*, 894 F.3d at 577; Fed. R. Civ. P. 26(g)(3).

REQUEST FOR PRODUCTION NO. 10: All calendars, notebooks, diaries, logs, correspondence, e-mail messages, text messages, voice mail messages, social media communications or posts, computer disks or other documents reflecting or relating to any of the claims alleged in your Complaint.

RESPONSE: None. Discovery is continuing.

REQUEST FOR PRODUCTION NO. 11: All documents and/or communications reflecting or relating to the averments in Paragraphs 15, 20-21, 23-25, 27-34, 36-38, 41-55, 57-59, 62-71, 73-75, 78-79, 81-82, 84-86, 88-95, 98, 100-108, 114-115, and/or 117 of your Complaint.

RESPONSE: Plaintiff objects to this Request on the grounds that it vague, overbroad, unduly burdensome, and not proportional to the needs of the case. Subject to said objection, none.

(Defs. Ex. P, Docket No. 51-16).

Plaintiffs do not meaningfully contest that the Bailey recordings are responsive to these requests and, and having reviewed same, the Court agrees that they were within the scope of the properly made requests and should have been disclosed. It is also this Court's opinion that Defendants met their burden to demonstrate that Plaintiffs' counsel violated Rule 26(g), without substantial justification. *See Grider*, 580 F.3d at 147 ("'Substantial justification' for the failure to make a required disclosure has been regarded as justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The test of substantial justification is satisfied if there exists a genuine dispute concerning compliance."). To this end, the responses omit the possession of the audio recordings that Bailey provided to the law firm in November of 2015 and assert boilerplate objections in opposition. However, the use of boilerplate objections is a disfavored practice and boilerplate objections should not be used for the purposes of delaying responses to legitimate requests while evaluating a potential privilege or to forestall the filing of a motion to compel by the opposing

party, as was done here. *See e.g., Liguria Foods, Inc. v. Griffith Laboratories, Inc.*, 320 F.R.D. 168, 185-87 (N.D. Iowa Mar. 13, 2017) ("the idea that such general or 'boilerplate' objections preserve any objections is an 'urban legend.'"). In addition, while it was objectively reasonable for Plaintiffs' counsel to investigate a potential privilege under the Fifth Amendment with respect to this evidence, such an investigation should have occurred prior to counsel responding to these discovery requests which were served on September 30, 2016. *See Grider*, 580 F.3d at 147. The timeline of events is such that Bailey and his counsel had more than five months to meet and review discovery, research and explore any ethical issue prior to formulating their responses.

Certainly, it was not objectively reasonable to proceed to notice and depose defense witnesses whose conversations were captured in the recordings in April of 2017 without first producing these recordings. *See e.g., Olivarez v. GEO Grp., Inc.*, 844 F.3d 200 (5th Cir. 2016) (affirming imposition of Rule 26(g) sanctions for party's withholding of recorded conversations prior to deposing opponents' witnesses). To the extent that Plaintiffs' counsel had doubts as to the production of the recordings at the time of responding to written discovery, the appropriate action would have been to seek a protective order from the Court. *See Kosher Sports, Inc. v. Queens Ballpark Co., LLC*, No. 10-CV-2618 JBW, 2011 WL 3471508, at *15 (E.D.N.Y. Aug. 5, 2011) ("plaintiff could and should have moved for a protective order to delay release of the recordings. While reasonable persons might disagree about the proper resolution of such a motion, 'no reasonable person, especially an attorney, could dispute that the initial step in resolving any such conflict would be to seek the guidance of the Court rather than pick a route of its own unilaterally' and without notice to opposing counsel."). Alternatively, counsel could have requested an extension of time and conferred with opposing counsel as to the dispute. *Liguria Foods, Inc.*, 320 F.R.D. at 187 ("A better approach to preserving rights and narrowing the scope of discovery, and

one likely to cause less ultimate delay and expense, would be to request an extension of time to respond and to confer on troublesome discovery requests.").  Such actions were not taken here; therefore, sanctions will be imposed for this violation of Rule 26(g).[19]

### b. Fuhs

Defendants also move for sanctions challenging the certifications as to Fuhs due to his production of two text message strings on June 5, 2017 or four days prior to his deposition.  (Docket No. 51).  Plaintiffs respond that they have a substantial justification for failing to disclose and produce the texts as they were temporarily lost in a transition between counsel at the law firm and also assert that any delays in production were harmless given that they were made available to Defendants prior to Fuhs' deposition.  (Docket No. 60).  Having considered the matter, the Court concludes that any such violation of Rule 26(g)(3) as to the two text message strings is harmless and that Plaintiffs have provided a substantial justification for failing to produce same at the time.

The relevant discovery responses are as follows.

> INTERROGATORY NO. 9:   Identify all email accounts, email addresses, social media accounts (including but not limited to, LinkedIn, Facebook, Instagram, MySpace), and social media communications (including but not limited to Twitter or blogs) that you have used since January 1, 2015, and identify the steps you took to preserve the information on these accounts, including the date you took those steps.
>
> RESPONSE: Plaintiff is not in possession of any texts or messages regarding his employment with McLachlan Drilling.  Plaintiff uses a Facebook account, but has not discussed this litigation in it. Plaintiff has not discussed this litigation in it.  Plaintiff has not deleted information from his email account or social media account. Discovery is continuing.

(Def. Ex. O, Docket No. 51-15 (dated 11/2016)).

---

[19]      Plaintiffs' assertion that the failure to disclose the recordings was harmless is overruled for the same reasons, i.e., Plaintiffs affirmatively used the information from the recordings during the defense depositions without disclosing them.  The Court cannot condone such discovery practices.

REQUEST FOR PRODUCTION NO. 10: All calendars, notebooks, diaries, logs, correspondence, e-mail messages, text messages, voice mail messages, social media communications or posts, computer disks or other documents reflecting or relating to any of the claims alleged in your Complaint.

RESPONSE: Plaintiff objects to this Request on the ground that it is overbroad and unduly burdensome. Subject to said objection, none. Discovery is continuing.

(*Id*. (dated 2/3/17)). Plaintiffs' Joint Supplemental Responses to Request for Production No. 10 dated April 21, 2017 states "See previous responses, and any documents previously produced. Plaintiffs are not withholding any documents on the basis of any objection." (Def. Ex. R, Docket No. 51-18).

Admittedly, the Fuhs' text messages (Blankenship exchanges and Campbell exchanges) were responsive to these legitimate interrogatories and document requests. (Pl. Ex. U, Docket No. 59-21). However, the Court will not exercise its discretion to sanction Plaintiffs for a few reasons. First, the production of documents represented appropriate supplementation of discovery consistent with Rule 26(e). *See* Fed. R. Civ. P. 26(e). Second, Plaintiffs' counsel and Fuhs have provided a substantial justification for their failures in that both the text messages and the cell phone itself were misplaced for a time while this litigation was ongoing and could not be produced. (Pl. Ex. O, Docket No. 59-15; Pl. Ex. KK, Docket No. 59-37). In this regard, Plaintiffs' counsel lost the text messages during a transition of lawyers at the firm, Fuhs could not find the phone initially but eventually did and forwarded those screenshots to his counsel. (*Id*.). Third, the errors are harmless in that the content of the text messages does not consist of critical evidence and while Campbell was deposed prior to the one text string being produced, his own phone was forensically searched and the same text string was not recovered. In all, the Court declines to sanction Plaintiffs for appropriately supplementing discovery responses under Rule 26(e). Accordingly, Defendants'

motion is denied insofar as they seek sanctions due to the late disclosure of these text messages from Fuhs' cell phone.

### C. Alleged Coaching of Witness

Lastly, Defendants seek sanctions due to the alleged coaching by counsel during Fuhs' deposition pursuant to Local Civil Rule 83.3. (Docket No. 51). Defendants request that the Court issue a "formal reprimand" for such behavior and preclude any evidence at trial arising from such conversation. (*Id.*). Once again, Plaintiffs oppose sanctions. (Docket No. 60). After evaluating the parties' arguments, the Court denies the request for sanctions due to the alleged coaching for several reasons.

Initially, Defendants' request is untimely as any disputes concerning Fuhs' deposition should have been brought to the Court's attention during the deposition which took place on June 9, 2017 rather than in their motion for sanctions filed more than four months later on October 11, 2017. *See Vay*, 2016 WL 1408116, at *10 ("Defendant has presented no explanation for its three-month delay in pursuing these sanctions. Accordingly, this factor supports denying Defendant's motion for sanctions."). Indeed, the Court specifically instructed counsel during the June 7, 2017 status conference that "[if there[..] [were] any problems in your deposition, let us know. I am available here today, tomorrow and Friday," i.e., June 7, 8 and 9, 2017. (Docket No. 43 at 19). Despite being on the June 7, 2017 conference call, defense counsel Mr. Pritchard did not contact the Court when this dispute arose during Fuhs' deposition two days later. Instead of presenting the dispute to the Court for an expeditious resolution, Defendants multiplied the proceedings by engaging in lengthy correspondence with opposing counsel and an unnecessary conferral process, prior to moving for sanctions several months later and continuing litigating same throughout supplemental briefing. (*See e.g.*, Docket Nos. 51; 63; 72; Pl. Exs. OO, PP, QQ). Because the

Court was available to referee this dispute at the time it arose, and Defendants failed to follow the established procedures, the request for sanctions must be denied. *See Vay*, 2016 WL 1408116, at *10.

Next, Defendants cite Local Civil Rule 83.3 in support of the requested sanctions but such rule does not independently authorize the issuance of sanctions. Rather, Local Civil Rule 83.3 generally incorporates the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania and states that a violation of those rules constitutes misconduct which may subject counsel to sanctions, including a formal reprimand. *See* W.D. Pa. LCvR 83.3A.2 ("Acts or omissions by an attorney admitted to practice before this Court, individually or in concert with others, that violate the rules of professional conduct adopted by this Court shall constitute misconduct and shall be grounds for discipline."). Here, Defendants have not cited any Rule of Professional Conduct which was violated by the alleged coaching during the deposition and, therefore, have not established that Plaintiffs' counsel committed misconduct potentially subjecting him to sanctions under the Local Rules. (*See* Docket Nos. 51; 63; 72).

Third, Defendants' motion must be denied because, following this Court's decision in *Peronis*, if there is improper coaching of a witness, the appropriate remedy is to permit questioning of the witness concerning the alleged improper coaching. To this end, this Court has held that:

> 6. Counsel and their witness-client shall not engage in private, off-the-record conferences during the depositions or during breaks or recesses, except for the purpose of deciding whether to assert a privilege.
>
> 7. Any conferences which occur pursuant to, or in violation of, guideline (6) are a proper subject for inquiry by deposing counsel to ascertain whether there has been any coaching of the witness, and to what extent.
>
> 8. Any conferences which occur pursuant to, or in violation of, guideline (6) shall be noted on the record by counsel who

> participated in same. The purpose and outcome of the
> conference shall also be noted on the record.

*Peronis v. United States*, Civ. A. No. 16-1389, 2017 WL 696132, at *2 (W.D. Pa. Feb. 17, 2017)

(internal citations omitted). The record reveals that although an objection was lodged, Fuhs was

asked about the alleged coaching and he responded that he remembered the information himself

and was not reminded by his counsel. (Pl. Ex. E, Docket No. 59-5). He writes similarly in his

declaration submitted during these proceedings. (Pl. Ex. KK, Docket No. 59-37). Further,

Plaintiffs subsequently offered to have Fuhs sit for a follow-up deposition and to be subject to

additional questioning on these points but the same was declined by Defendants. (*See* Pl. Ex. OO,

Docket No. 59-41 at ¶ 17).

For these reasons, Defendants' motion for sanctions is denied to the extent that they seek

a formal admonition from the Court for allegedly improperly coaching a witness or to exclude any

such evidence.

V.     CONCLUSION

Based on the foregoing, Defendants' motion for sanctions [50] has been granted, in part

and denied, in part, in the Order entered on September 27, 2018. The parties shall adhere to the

briefing schedule that has been established for Defendants' filing of a motion for attorneys' fees

and costs.

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Dated: October 26, 2018

cc/ecf: All counsel of record.